IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ARMANDO CARRILLO, Individually | § | |
| and as Representative of the Estate of | § | |
| DANIEL EMILIO CARRILLO, deceased, | § | |
| and ALICIA CARRILLO | § | |
| | § | |
| vs. | § | Case Number: 2:20-cv-00028 |
| | § | |
| | § | JURY TRIAL REQUESTED |
| OLIVER BUENDIA; MARCUS LOPEZ; | § | |
| THOMAS LOWKE; JESUS GALVAN; | § | |
| EDUARDO GONZALEZ; JOSE | § | |
| RODRIGUEZ; VERONICA GARCIA; | § | |
| and, NUECES COUNTY, TEXAS | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

This amended pleading is filed as a matter of course under Fed. R. Civ. P. 15(a)(1)(B).

It removes defendants Eduardo Gonzalez and Veronica Garcia.

Plaintiffs anticipate filing Stipulations of Dismissal as to such defendants.

Now come Armando Carrillo, Individually and as Representative of the Estate of Daniel Emilio Carrillo, deceased, and Alicia Carrillo "Plaintiffs" complaining of Defendants Oliver Buendia, Thomas Lowke, Jesus Galvan, Jose Rodriguez, Marcus Lopez, and Nueces County Texas and files this their First Amended Complaint, and for cause of action would respectfully show unto the Court as follows:

## Summary of Complaint

This case arises out of the March 5, 2018, homicide[1] of inmate Daniel "Danny" Emilio Carrillo ("Danny" or "Carrillo") at the hands of Nueces County Jail's Lieutenant Lowke, and, his

---

[1] County of Nueces Office of Medical Examiner. Report of Postmortem Examination, Daniel

subordinate correctional officers, Corporal Buendia, and jailers Galvan, Rodriguez, and Lopez. Danny was diagnosed, at different times with schizophrenia, major depression, anxiety disorder, bipolar disease, and polysubstance abuse; he was heavily medicated and morbidly obese at five-feet, six-inches and 295 pounds. While Danny was in the throes of a needlessly prolonged psychotic[2] event on March 5, 2018, jailers with the Nueces County Jail used excessive force and "tasered" Danny under the auspices of a "cell-extraction." However, in direct violation of state and national standards, no medical personnel were included in the operation. Even worse, the purported rationale for the extraction that was provided to State investigators was to move Danny "closer" to medical personnel.  The violent and needless extraction resulted in Danny's death by sudden cardiac arrest. The acts of Lieutenant Lowke and his subordinate Jailers resulted in violations of the Constitutional rights of Danny Carrillo, and, such Constitutional violations were proximate causes of Danny's suffering and death.

## I. JURISDICTION AND VENUE

1.      This court has jurisdiction over the claims raised in this complaint under 42 U.S.C. §1983 and 28 U.S.C. §1331.

2.      Venue is appropriate in the Southern District of Texas under 28 U.S.C. §1391 because the acts giving rise to Plaintiffs' claims all occurred in the Southern District of Texas.

3.      Plaintiffs further invoke the supplemental jurisdiction of this court pursuant to 28 U.S.C. §1367 to adjudicate pendent claims arising under Texas law.

## II. PARTIES

---

Carrillo, Deceased. March 5, 2018. "MANNER OF DEATH:  HOMICIDE."

[2] "Psychosis" is severe mental disorder in which thoughts and emotions are so impaired that contact is lost with external reality.

4.     Plaintiff Armando Carrillo, is, and was at all times mentioned herein, a competent adult who appears both individually and as the personal representative of Daniel Emilio Carrillo, deceased.  Plaintiff was the Natural Father of decedent, Daniel Emilio Carrillo.

5.     Plaintiff Alicia Carrillo, is, and at all times mentioned herein, a competent adult who appears individually.  Plaintiff was the Natural Mother of decedent, Daniel Emilio Carrillo.

6.     Plaintiff the Estate of Daniel Emilio Carrillo, deceased appears by and through its Representative, Armando Carrillo, and may maintain causes of action and recover damages for the value of decedent's life and decedent's pain and suffering. Decedent Daniel Emilio Carrillo died intestate and at the time of his death there were no estate debts.  Therefore, no administration of his estate is pending nor is administration necessary.

7.     Defendant Oliver Buendia is an individual resident of Nueces County, Texas.

8.     Defendant Thomas Lowke is an individual resident of Nueces County, Texas.

9.     Defendant Jesus Galvan is an individual resident of Nueces County, Texas.

10.     Defendant Jose Rodriguez is an individual resident of Nueces County, Texas.

11.     Defendant Marcus Lopez is an individual resident of Nueces County, Texas.

12.     Defendant Nueces County is authorized by the laws of the State of Texas to operate the Nueces County Jail.  As part of its responsibilities and services, Nueces County also operates a law enforcement agency, the Nueces County Sheriff's Office, that, among other duties, operates and controls the Nueces County Jail System, including the Nueces County Jail.  Defendant Nueces County is located at 901 Leopard Street, Corpus Christi, Texas 78401, in Nueces County, Texas. Defendant Nueces County employed persons including Oliver Buendia, Thomas Lowke, Jesus Galvan, Eduardo Gonzalez, Jose Rodriguez, Veronica Garcia, Marcus Lopez, and other employees who, in the course and scope of their employment were required to observe, watch over, and

3

manage persons placed in custody within Nueces County Jail.  Buendia, Lowke, Galvan, Gonzalez, Rodriquez, Garcia, and Lopez are collectively referred to herein as "the Jailers." At all relevant times herein, the Jailers, and Nueces County, acted under color of law and pursuant to certain customs, policies, or practices that were the moving force behind the constitutional violations asserted herein.

### III.  Factual Background

#### Carrillo's "Criminal" Record

13.     On March 24, 2014, Daniel "Danny" Emilio Carrillo was in the remains of his Great Uncle's abandoned and dilapidated home in Robstown, Texas, foraging for metal to recycle for cash. Danny was arrested while at the former home and charged with Burglary of a Habitation. Later, the home was condemned and razed by the City. Adjudication of the charge was deferred for three-years. As is typical for mentally ill persons on deferred adjudication, he only made it 2-years and, for whatever reason, the deferred adjudication was revoked, the charge was adjudicated and Danny was sentenced to probation. As part of his probation, he entered an in-patient treatment center for his mental illness and substance abuse problems. By early 2018, he was discharged to a transitional/halfway house; but, eventually, he left the center early. As a result, it was believed a warrant for his arrest had issued.  On February 12, 2018, Danny and his Father Armando went to the Nueces County probation office to try and work things out. They were told to register with Alcoholics Anonymous, which they immediately did. While Danny's Father waited to take his son home, suddenly, and unexpectedly, a CCPD officer arrived, arrested Danny at the probation office and took him to the Nueces County jail.

#### Danny's Psychiatric Disease

4

14.     Over the years prior to his February 12, 2018 incarceration at the Nueces County jail, Danny was diagnosed with schizophrenia, major depression, anxiety disorder, bipolar disease, and polysubstance abuse. At the time he was admitted into the Nueces County jail, the jail personnel were informed that Danny had a history of treatment for depression, anxiety, schizophrenia and that he had a history of use, and abuse, of the pharmaceuticals, Buspar, Zoloft, Trazadone, Risperdal, and benzodiazepines (Xanax and Clonazepam), and that Danny had been a longtime patient of the late-psychiatrist Gilbert Maldonado, M.D. While he was being processed into the jail on February 12, 2018, Danny reported hearing voices, he was tearful, his appearance was "disheveled," and his mood was described as "anxious."

**Danny's Obesity**

15.     At five-feet, six-inches tall, and weighing 295 pounds, Danny Carrillo had a body mass index of 44.91. Under guidelines issued by the Centers for Disease Control, that means he was suffering from the most extreme form of obesity, "Class 3" which is also described as "extreme," "severe," or "morbidly obese."[3]   Danny's obesity greatly increased his risk of death from sudden cardiac arrest.[4]  Sudden cardiac arrest is not the same thing as a heart attack. "A heart attack is when blood flow to the heart is blocked, and sudden cardiac arrest is when the heart malfunctions and suddenly stops beating unexpectedly. A heart attack is a 'circulation' problem and sudden cardiac arrest is an 'electrical' problem."[5]

---

[3]  https://www.cdc.gov/obesity/adult/defining.html.  Accessed on January 14, 2020 at 2:40 p.m. CST.

[4]   https://www.nhlbi.nih.gov/news/2018/obesity-may-lead-sudden-cardiac-arrest-among-young. Accessed on January 14, 2020, at 2:48 p.m. CST.

[5]  https://www.heart.org/en/health-topics/heart-attack/about-heart-attacks/heart-attack-or-sudden-cardiac-arrest-how-are-they-different.  Accessed on January 14, 2020, at 2:53 p.m. CST.

**March 4, 2018, and the days before**

16.     Between February 12 and March 3, 2018, Carrillo's mental condition declined. While incarcerated, Mr. Carrillo began to experience withdrawal symptoms because his body was physically dependent on the medication Xanax, which his anxiety disorder had been treated with for many years. On February 18, 2018, in a conversation with his father Armando Carrillo, Danny stated that he had informed jail staff that he was experiencing withdrawals due to not having access to Xanax because he was placed on "lockdown" and not administered the medication.

17.     On February 28th, while incarcerated, Danny spoke to his Father on the phone and told him that he was going to "go crazy" if he wasn't released soon.  In another call that day, Danny told his Father that he was receiving and taking Xanax from a "friend inside the jail." His Father voiced concern about Danny's mental wellbeing. Around this timeframe, jailer defendant Rodriguez described Danny as "off" and in an "altered state of mind."  In a March 1 phone call with an employee of his lawyer, Danny told the employee that he got into something with "Tango Blast," that he was having problems and that he was suffering from anxiety.

18.     By March 2 and 3, 2018, Carrillo was "very emotional and [...] crying."  On March 3, 2018, Danny spoke with his Father on the phone. Unlike the prior 12 calls between them, this call did not start with a greeting, but, rather, Danny declaring that "There's some sh-- going on that no one can control outside in the world and the guards have something to do with it." Danny described, in hushed tones, that the guards were setting him up to fight with "Tango members." Danny continued to whisper and speak quietly, as his Father tried to encourage Danny to be strong and prepare for his upcoming court hearing. His Father expressed concern about Daniel's mental health and his self-medication.

19.     On March 3 and 4, 2018, Carrillo was seen in his cell nude, throwing his belongings out of his cell while crying, "I'm sorry!"  He cried in his cell for two-days.  According to one inmate, "Carrillo started acting like a baby, crying all day and night."

20.     On the night of March 4, 2018, and, specifically, by 1:00 a.m. on March 5, 2018, Danny was an inconsolable, blabbering person suffering through a psychotic episode.

21.     During his mental deterioration, according to jailers and inmates, Danny kept "hearing stuff and seeing stuff" that wasn't real. "He was hallucinating" and "crying in his cell." Although Carrillo was distressed, he was locked in a cell unarmed and did not pose a threat to the Officers, other County employees, himself, or inmates and detainees.

22.     On the evening of March 4, early morning of March 5, a guard yelled at Carrillo "Shut the f--- up; you shouldn't have came (sic) to jail." Another guard taunted Danny and "talked sh-- to the dude." After Danny cried like this for some time, defendant "Galvan became irritated, opened the door to Carrillo's cell and 'beat his ass.'"  Officer Rodriguez in his written statement described Carrillo's state in an interaction between the two just minutes before the extraction as "belligerent, irate and off." But instead of calling for medical assistance, he and other officers reacted angrily.

23.     It was amidst this enraged and anger-fueled environment that a violent and unreasonable (alleged) cell extraction took place. Despite the complete lack of any threat, four officers – Buendia, Garcia, Galvan and Rodriguez – assembled to perform the alleged extraction; however, the officers did not enter Carrillo's cell because he presented a risk of harm to himself and others, rather, it was for punitive reasons. Rather than leaving Carrillo in his cell and observing him for self-harm (which was never documented to have occurred), the hazardous and anger-fueled cell invasion was executed.

24.     Jailer Garcia opened the door to Carrillo's cell.  Jailers Galvan and Rodriguez and Corporal Buendia rushed into the cell and took Carrillo to the ground onto his stomach with his feet toward the door and his head toward the back wall of the cell.  Guard Garcia radioed for additional assistance and entered the cell to try and put handcuffs on Carrillo.  Garcia denies that any of the officers were giving Carrillo any sort of orders or commands at that time. When Lieutenant Lowke and Lopez arrived, Lopez, who is a very large man, climbed over to the area near Carrillo's head and immediately dug his knee into Carrillo's upper back and put pressure onto Carrillo's back while Carrillo was prone on the floor.  Guard Garcia had already gotten a handcuff onto Carrillo's right arm and then Officer Rodriguez took that restraint from Garcia. While Lopez dug his weight into Carrillo's upper back, he was able to grab ahold of Carrillo's left hand and complete the handcuffing of Carrillo.  Lopez told Garcia to get out of the way so that the men could deal with Carrillo. Garcia began to exit the cell by climbing up onto the bed rack and heading toward the door.  As she did so, she saw Lieutenant Lowke drive stun taser Carrillo in the back. According to Garcia's interview with the investigating Texas Ranger, Carrillo was already handcuffed behind his back when Lowke drive-stun tasered him. Garcia was instructed by Lowke to go get leg irons from intake. When she returned with them, she was informed they would not be needed because, while he was still in the cell, Carrillo was non-responsive and had defecated on himself. When a nurse eventually arrived, Carrillo was still prone on his stomach and had no pulse. Carrillo's nose was broken and bleeding, his face was dark-purple bruised and blood covered his face. His right eye was very swollen and shut from being beaten and there was fluid buildup behind his eye. When asked by Texas Rangers whether she saw anything that made her think "that don't look right" or was "unusual" the nurse responded, "his right eye, the bloody nose and him going from alert oriented to non-responsive."

25.     An inmate who claims to have witnessed the event stated that the guards were "pounding" Carrillo and believes he saw Officer Lopez "stomping the dude's f------ head."

26.     According to another inmate, when Carrillo's dead body was rolled out on a stretcher, "Carrillo's face looked like it got hit by a truck and it was covered in blood."

27.     The Nueces County Medical Examiner determined "homicide" was the manner of Carrillo's death.  Black's Law Dictionary defines "homicide" as "[t]he killing of one human being by the act, procurement, or omission of another."[6] Carrillo's mental and physical illnesses were not the cause of Carrillo's death; rather, the acts and omissions of defendants described herein were.

28.     The Jailers could all see, feel, hear, and otherwise sense the events leading to Carrillo's death which are described in this Complaint. Despite knowing that their acts and omissions were causing Carrillo severe physiological distress and placing him at risk of imminent death, the Officers continued those actions disdainfully and with a complete disregard for Danny's safety, medical needs, and constitutional rights.

**Cell Extraction**

29.     "The mission of the Texas Commission on Law Enforcement, as a regulatory State agency, is to establish and enforce standards to ensure that the people of Texas are served by highly trained and ethical law enforcement, corrections, and telecommunications personnel."[7] Texas Commission on Law Enforcement ("TCOLE") training is designed to avoid situations that result in violations of prisoners' constitutional rights.  (*See* TCOLE Course No. 3504, *January 2010*, Use

---

[6] https://thelawdictionary.org/homicide/.  Accessed on January 14, 2020 at 1:55 p.m. CST.

[7] https://www.tcole.texas.gov/content/tcole-mission.   Accessed January 14, 2020 at 4:12 p.m. CST.

of Force in Jail Setting, p. 6). It is axiomatic as part of such training that "[i]n no situation is use of force in a jail setting justifiable as a punishment."   TCOLE training mandates that cell extractions be executed by an "Emergency Response Team," which is a designated, specially selected, trained and predetermined team of (typically five (5) members and a supervisor) that has been specifically trained for cell extractions.  (*Id.,* pp. 58-59).  Each team member is to "have a predetermined area of responsibility (i.e.:  pin the inmate, secure right arm, secure left arm and handcuff, secure right leg and secure left leg). Each team member should be equipped with protective equipment." (*Id.*).   In addition, "medical attention/first aid" for the inmate is to be provided. (*Id.*) TCOLE training dictates that failing "to follow proper procedures can make a situation more dangerous." (*Id.* at p. 68).[8]

30.    The Texas Department of Criminal Justice's April 2017 Use of Force Plan "is intended to prevent unnecessary or excessive uses of force" within correctional settings. The UOF Plan's § III. J. addresses cell extractions, or, "Forced Moves." The State's guidelines require that certain steps and procedures be taken in cell extractions, several of which were not taken by the Jailers who allegedly attempted to extract Carrillo. The TDCJ's UOF Plan requires that authorization for a forced move can only come from the highest-ranking shift supervisor on duty at the time. It does not appear the highest-ranking shift supervisor on duty authorized the Carrillo extraction.

---

[8] TCOLE training teaches jailers that in evaluating whether a use of force was excessive, or unreasonable, for purposes of §1983 Fourth or Eighth Amendment liability, among other factors to be considered, whether there was a "need for force will be evaluated.  The feasibility or availability of alternatives are considerations."  (*Id.* at p. 69). Also, "[m]otivation for the force will be evaluated. Whether the force was used to maintain or gain control or to harm will be considered" and "[t]he extent of injury inflicted will be evaluated."  *Id.* Another inquiry TCOLE training indicates may reveal excessive use of force is "[w]hether the officer's actions created a situation of dangerousness where a fatal error was likely."  *Id.*

31.     The TDCJ's UOF Plan requires that any officer "who has had prior confrontational contact with the offender not be allowed on the [extraction] team, especially if the offender's actions were hostile or aggressive toward that officer." In direct violation of TDCJ standards, the Carrillo extraction was spearheaded by officers Galvan and Rodriguez who had had confrontational contact with Carrillo immediately prior to the extraction.

32.     The TDCJ's UOF Plan requires that prior to the extraction, the "supervisor in charge shall notify licensed medical staff of the impending use of force and request they be present, if possible. Licensed medical staff shall advise of any existing medical problems that preclude the use of force." Despite Carrillo's obvious mental and physical medical problems, and the apparent availability of qualified medical personnel, no medical staff were consulted or present during the extraction.

33.     The TDCJ's UOF Plan requires that one officer record the extraction with a video camera; however, the Carrillo extraction was not recorded in any manner.

34.     "In addition to causing physical harm—in some cases, serious or lethal physical harm – cell extractions can exacerbate the symptoms of a person suffering from mental illness. According to a psychiatric expert who spoke to Human Rights Watch, trauma from one use of force can aggravate pre-existing conditions, trigger a psychotic episode, or deepen depression or mania." Preventable Tragedies: How to Reduce Mental-Health Related Deaths in Texas Jails. The University of Texas School of Law Civil Rights Clinic. November 2016, p. 83.[9] "Because forced extractions are dangerous, officers should avoid them unless there is an emergency, and be trained instead to summon mental health staff, talk further with the inmate, and give him time to cool

---

[9] https://law.utexas.edu/wp-content/uploads/sites/11/2016/11/2016-11-CVRC-Preventable-Tragedies.pdf.  Accessed on January 14, 2020 at 4:38 p.m. CST.

down. Medical or mental health staff should be present at every planned cell extraction, according to experts. The Los Angeles County Jail recently revised its cell-extraction policy to require a mental health professional to be present to try to resolve the situation before any cell extraction. Following the death of Kenneth Lucas, the Harris County Jail added a medical staffer to the jail's cell-extraction team." *Id.* at p. 84.

35.     Even if an inmate assaults an officer, the Eighth Amendment doesn't permit another officer to impose corporal punishment in the form of a broken jaw or nose. *See, Madrid v. Gomez*, 889 F.Supp. 1146, 1164 fn. 24 (N.D. Cal. 1995).  "Cell extraction [...]is an undeniably violent maneuver [...]. It also results in frequent injuries and infliction of pain [...] 'cell extractions are a very, very violent maneuver ... Inmates get hurt and staff get hurt, and it's just the nature of the thing.' [...] cell extractions should be performed only when necessary. Indeed, under normal circumstances, an inmate should not be extracted absent an imminent risk to the safety and security of the institution." *See id.,* 889 F.Supp. at 1172.

36.     TCOLE training, TDCJ training, and common sense dictate that jailers who may have been previously victimized by the inmate who may be extracted from his jail must not be a part of the team that performs the extraction.  "It is generally understood [...] that such a practice should be avoided to allow the situation to defuse and preclude the potential for retaliation." *Id.*at 1178.  "[Y]ou may have an incident where the cop [...] got bit, spit on, or whatever, and he may be a little mad. You don't want to put him back in there and make him ... do something that he would not normally do." *See id.* Unfortunately, in direct violation of TCOLE and TDCJ training on cell extractions and common sense, Nueces County allowed jailers Galvan and Rodriguez to be involved in the fatal extraction of Carrillo, despite the fact they were subjected to Carrillo's physical <u>and</u> verbal abuse that he displayed during his psychotic episode.

**Taser**

37.    While there are multiple volitional acts by the Jailers that caused Carrillo's death – the ill-advised decision to perform an alleged cell extraction, the unnecessary beating of Carrillo, the restraint process and the lack of medical personnel attendance – when a Taser, or, Electronic Control Weapon (ECW) was negligently used on Carrillo while he was restrained in his cell, the already grave risk to his heart was multiplied.   "ECD stimulation can cause cardiac electrical capture and provoke cardiac arrest resulting from ventricular tachycardia/ventricular fibrillation." Zipes, Sudden Cardiac Arrest and Death following Application of Shocks from a TASER Electronic Control Device. *Circulation: The Journal of the American Heart Association. New York.* May 22, 2012.[10]

38.    The United Nations (UN) Committee Against Torture, after reviewing the United States' compliance with the Convention Against Torture, raised concern about the "extensive use" of ECWs by United States law enforcement personnel and called for them to be used only as a substitute for lethal force weapons. The UN Human Rights Committee, reporting on the United States' compliance with the International Covenant on Civil and Political Rights, expressed similar concerns, and called for ECWs to be used only in situations where "greater or lethal force would otherwise have been justified."

39.    "There are significant risks associated with Electronic Control Weapons ("ECWs"), such as cardiac capture, where the current sends the detainee's heart rhythm into overdrive. A guidance manual produced by the Department of Justice's Community Oriented Policing Services stated that ECW policies should recognize ECWs as weapons with 'the potential to result in a fatal

---

[10] https://www.ncbi.nlm.nih.gov/pubmed/22547671.   Accessed on January 14, 2020 at 5:00 p.m. CST.

outcome even when used in accordance with policy and training,' and therefore should be a last-resort option. The manual also emphasized that jailers should employ non-force options such as communication and de-escalation practices before even considering ECWs as an option. Even then, officers must consider whether the detainee poses such a threat to safety that use of potentially lethal force is appropriate." Preventable Tragedies: How to Reduce Mental-Health Related Deaths in Texas Jails. The University of Texas School of Law Civil Rights Clinic. November 2016, p. 85.

### Mentally Ill Inmates and the Nueces County Jail

40.     "County jails around Texas [...] regularly house inmates with mental disorders and co-occurring substance use disorders.  These inmates have substantial needs for health care, and when those needs are unmet, the consequences can be fatal. [...] A significant percentage of county jail inmates have mental disorders. Some studies estimate that in the nation's jails, 14.5 percent of men and 31 percent of women suffer from serious mental illness.  Over 70-percent of people in jails who have serious mental illness also suffer from co-occurring substance use disorders. Despite this, studies show that between 83 and 89 percent of people in jails and prisons do not receive adequate care."  Preventable Tragedies: How to Reduce Mental-Health Related Deaths in Texas Jails. The University of Texas School of Law Civil Rights Clinic. November 2016, p. 5.

41.     In March 2018, Nueces County was no exception. "Statistics tell us that 20 to 25 percent or more of those in our jails have some mental problem — they don't belong in jail," said Nueces County Judge Lloyd Neal at a March 14, 2018, meeting of the county commissioners' court. "They belong in a treatment facility," he said. And the County's Sheriff agreed, reportedly telling a Caller-Times reporter that he "would explore other avenues for people with mental health

issues who are housed in the jail, saying they shouldn't be there."[11] Despite acknowledging that mentally ill inmates do not belong in the jail, Nueces County routinely violated standards that dictate that mental health professionals be consulted prior to application of force on a person enduring a mental health crisis.

42.    Mentally disabled prisoners are faced with distinct issues within jails/prisons. Custody staff commonly receive little or no training in managing inmates with mental disabilities. They are not given information on the nature of different mental health problems and the symptoms that may episodically or chronically result from them. [...] They do not understand that, for example, prisoners "who are hearing voices, [are] manic or severely depressed …[and] ... may lack the capacity to regulate their behavior with the same speed and responsiveness as someone who is not suffering such distress." They are not given the training that would help them distinguish between erratic behavior that is symptomatic of mental illness and genuine aggression. Custodial staff are also rarely trained in verbal de-escalation and crisis intervention techniques that can be useful when confronting an agitated or violent prisoner whose mental condition is deteriorating and who is experiencing an increase in symptoms and a loss of function. The importance of such training is manifest.

43.    According to the international non-governmental organization, Human Rights Watch, often mentally impaired inmates don't understand what's going on and they don't really know what they are being asked to do.[12] "They often perceive the officers' orders as threats, as an

---

[11] https://www.caller.com/story/news/crime/2018/10/18/takeaways-new-nueces-county-sheriffs-interview/1673854002/#  Accessed on January 25, 2020 at 11:30 a.m.
[12] Human Rights Watch, Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails and Prisons 29 (2015), available at https://www.hrw.org/sites/default/files/reports/usprisoner0515_ForUpload.pdf .  Accessed on January 25, 2020 at 11:17 a.m.

attempt by some force to do something bad to them, so they retreat, and they refuse to comply." *Id.* at p. 29. "Our research suggests the typical correctional response to difficult, disruptive, or dangerous behavior by prisoners with mental illness differs little from the response to any other inmate who breaks the rules—punishment, solitary confinement, and the use of force. In some facilities, these responses are the default mechanisms for responding to the inadequacies of mental health services for prisoners in the United States." *Id.* at 30.

44.     The American Correctional Association's Core Jail Standards state that the use of force must be "restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort [...] In no event is physical force used as punishment."[13]   The American Bar Association's (ABA) Standards for Treatment of Prisoners state that officers should use force only "to protect and ensure the safety of staff, prisoners, and others; to prevent serious property damage; or to prevent escape" and "as a last alternative after other reasonable efforts to resolve the situation have failed."[14] Additionally, the ABA's standards state that "staff should seek intervention and advice from a qualified mental health professional prior to a planned or predictable use of force against a prisoner who has a history of mental illness or who is exhibiting behaviors commonly associated with mental illness." *Id.* at 133.  As part of the settlement of a case brought on behalf of Pennsylvania inmates with mental illness, the Pennsylvania prison system revised its Use Of Force (UOF) policy to state that "[i]f an inmate with [mental illness] presents a non-emergency security threat, a [mental health

---

[13]http://corrections.wpengine.com/wp-content/uploads/2014/09/Core-Jail-Standards-as-printed-June-2010.pdf  at p. 17.  Accessed on January 25, 2020 at 11:44 a.m.

[14]https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.authcheckdam.pdf at p. 132. Accessed on January 25, 2020 at 12:11 p.m.

professional], a person who is appropriately trained in Crisis Intervention, or a member of the Hostage Negotiation Team will be notified and that person will attempt to de-escalate the situation so that use of force is not necessary and/or to reduce the level of force required."[15]

45.      Guidelines published by the National Institute for Corrections (NIC) emphasize the importance of training correctional officers to work with the mentally ill. According to the NIC, correctional officers need training similar to that given to workers in state psychiatric hospitals in order to successfully manage inmates with mental illness. A consensus guide published by the Council of State Governments on handling the mentally ill in criminal justice settings recommends at least two hours of mental health training for law enforcement personnel so that officers will know how "to stabilize and de-escalate" situations. A law enforcement officer is quoted in the Houston Police Department's guide for responding to the mentally ill as saying, "I have had crisis intervention training and whole heartedly endorse it. It has helped me verbally de-escalate the vast majority of situations I have encountered involving individuals in serious mental health crisis, rather than having to use force." A number of jails around the country have responded to litigation by agreeing to train correctional officers to identify signs of mental illness, respond effectively to inmates with mental illness, and make referrals to mental health staff. For example, the Los Angeles County Jail agreed to provide "'custody-specific, scenario based, skill development training' for staff to enable them to identify and work with inmates who have a mental illness as well as such training in crisis intervention and conflict resolution."

46.      "[B]ased on its reading of federal law, this Court holds that prison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities

---

[15] Human Rights Watch, Callous and Cruel, at p. 49, citing, *Disability Rights Network of Pennsylvania v. Wetzel*, No. 1:13-CV-00635 (M.D. Pa. Jan. 9, 2015) (ECF No. 59).

who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs." *Pierce v. District of Columbia, Pierce*, 128 F.Supp.3d 250, 272 (D.D.C. 2015)

47.     When Carrillo entered the jail, we know from phone calls between him and his father that as time progressed, his mental state worsened. Instead of having a psychological evaluation performed during this initial phase of degradation, the Jailers left him in his cell for multiple days, until he had completely broken. It wasn't until he was combative, hallucinating, and in a full psychotic state that the jailers then chose to extract him from his cell, for the purported purpose of a psychological evaluation. This gross mistreatment and lack of care for mentally ill inmates is not only unconstitutional, it also creates an environment where those who need help the most do not receive it.

48.     Texas' Commission on Jail Standards mandates that "Inmates exhibiting behavior indicating that they are a danger to themselves or others shall be managed in such a way as to minimize the threat of injury or harm."  37 Tex. Admin. Code §273.6.  The alleged threat posed by Danny prior to the extraction was to himself only because Carrillo was locked-up in his cell. Tellingly, after the extraction when emergency personnel arrived to try and revive the deceased Carrillo, the Jailers falsely reported to the emergency medical personnel that Carrillo "had been fighting with 4 guards and was tasered and wrestled to the ground."

49.     Danny died in the early hours of Monday, March 5, 2018. Tragically, he was scheduled to appear that day at 1:15 p.m. at a hearing on a motion to revoke his probation. Had the fatal extraction not occurred, there's little doubt the Honorable Judge of the 117th Judicial District

Court of Nueces County, Texas would have appreciated that Danny was too ill for the inadequate resources available at the Nueces County Jail in March 2018 for properly dealing with mentally ill inmates like him.

50.     Ten-days after overseeing Carrillo's homicide, defendant Lt. Lowke attended his first Use of Force course, a non-intermediate core course.

### IV. CAUSES OF ACTION

### A. Eighth Amendment Excessive Force Constitutional Violation.
### (42 U.S.C. § 1983)

51.     Plaintiffs hereby incorporate all preceding paragraphs and further allege as follows. Danny was subjected to cruel and unusual punishment, in direct violation of the Eighth Amendment to the United States Constitution.  The Jailers used excessive force against Carrillo, and their excessive force resulted in Carrillo suffering painful and fatal injuries. The circumstances of the violent cell extraction clearly show that the force used by the Jailers was not applied in good faith because Carrillo did not pose a threat to other inmates or any jail personnel, his psychosis was provocative to the Jailers, and Jailers Galvan and Rodriguez had already gratuitously beat up Carrillo prior to the extraction, encounters that inflamed and provoked such jailers. The force used by the Jailers was not applied to maintain discipline because Carrillo wasn't knowingly violating any disciplinary standards, rather, he was suffering from a debilitating mental disease process.  The force used by the Jailers was not applied to restore discipline because the discipline of the jail had never been compromised, and, Carrillo was already restrained at the time he was tasered.  The force applied by the Jailers included that applied by Galvan and Rodriguez, jailers who were provoked and whose conduct was motivated by anger and frustration; not in good faith and in the interests of order and discipline. Jailers Galvan's and Rodriguez's conduct in applying ultimately fatal force clearly reflected their desire to inflict harm or pain.  Minimum standards dictated that

Jailers Galvan and Rodriguez be excluded from the jail extraction because of the risk of their conduct being motivated by an intent to inflict injury or pain, and, not based on just cause. Jailers Galvan's and Rodriguez's actions were motivated by such an intent to inflict injury and pain; and, they succeeded as Carrillo experienced severe pain and injury.

52.     In evaluating the measure of force employed by the Jailers, the usual deference afforded Jailers in adopting and executing policies and practices they deem necessary to preserve internal order and discipline and to maintain internal security should be disregarded, or regarded lightly, because the unruly conduct of a mentally-ill inmate experiencing an acute psychosis, alone in his cell, is not the risk posed by volitional conduct of a misbehaving, otherwise healthy inmate. The former is a medical situation that Constitutionally demands a medical response; the latter is obvious, but absent from the facts of March 5, 2018.

53.     An evaluation of Carrillo's injuries and death; applying great weight to his upper back while in a prone position; tasering him after he was already restrained in a prone position; the lack of an objective need to violently extract him from his cell; the disproportionate or wrongful application of force to a morbidly obese psychiatrically ill person; the lack of any risk to others posed by Carrillo while he was alone in his cell; and, the failure by Jailers to follow common cell-extraction practices and procedures, all, at a minimum, raise a fact issue as to whether Carrillo's right to be protected from cruel and unusual punishment was violated.

54.     Carrillo was a medically complex inmate whose disease processes demanded an appropriately sophisticated response in order to ensure preservation of his Constitutional rights under the Eighth Amendment.  An inmate who is a person whose body is morbidly obese, and who has been diagnosed by psychiatrists with the diseases of schizophrenia, major depression and anxiety disorder is not an inmate that can be properly incarcerated in a general pretrial population

without appropriate attendant medical care. He is definitely not an inmate that can be disciplined in the same manner as inmates who are not morbidly obese and do not suffer serious and debilitating psychiatric diseases.  And under no set of circumstances would it be reasonable to subject a sick and vulnerable inmate like Carrillo to the violent sort of cell extraction that was the cause of his injuries and cardiac arrest death.

55.     The two beatings that Carrillo endured prior to his death resulted in a swollen right eye with obvious edema, a broken nose, dried blood all over his face, multiple forehead abrasions, the left side of his nose was lacerated and abraded and the temple area of his scalp was hemorrhaged.  His right upper and lower back suffered contusions and abrasions, as well as right upper arm and his left elbow and upper left arm.  He was described as having "blood over most of his face and chin [...] [w]et and clammy lips blue." He was drive-stun tasered on his back; inches from his heart.

56.     The cell extraction's physical force and electrical force applied to Carrillo's trunk was not reasonable under the circumstances because Carrillo was already restrained, and, the nature and quality of the force applied to a morbidly obese and severely mentally ill person was disproportionate to the jailers' rights to use some degree of force or coercion to try and achieve the presumed goal of an orderly jail. To the extent the jailers purport to justify their conduct in the extraction as necessary to move Carrillo to the medical clinic for treatment of this mental diseases, then their alleged rationale becomes even more tenuous. Obviously, it would never be a reasonable medical response to try and medically assist a morbidly obese inmate known to be suffering an acute psychiatric episode by beating him, tasering him, and violently removing him from his cell. Besides, if that was the true purpose of the extraction, why weren't the medical attendants present for the extraction? Especially considering the fact that it is "industry standard" to include medical

attendants even when the extraction is *not* to move an inmate to a mental health-related destination, but to extract him for general safety-related reasons.  Such facts and circumstances raise the reasonable inference that the extraction was actually not an extraction at all, but, rather, another punitive exercise to punish or silence Carrillo whose psychotic episode was disrupting the unit.

57.     While enduring the acute psychiatric episode within his cell, Carrillo posed no immediate threat to the safety of the jailers and other inmates.  Only after officers initiated their unreasonable and un-Constitutional cell extraction of the morbidly obese inmate suffering a severe psychotic episode did any risk to the jailers arise. A reasonable, responsible, and Constitutionally permissible response to such a psychiatric episode involving a morbidly obese inmate would attempt to minimize the inmate's opportunity for resistance.  Instead, the jailers – with no medical attendants – chose to engage Carrillo in a manner that maximized the opportunity for him to resist.

58.     The jailers' conduct at issue was not a result of split-second decisions made during an unforeseen, tense, uncertain and rapidly evolving situation. Carrillo was already a jailed inmate in his own cell. A properly executed, Constitutional cell-extraction reduces uncertainty and tension. Having a properly staffed team, with medical attendants on-hand, executing a briefed and rehearsed plan of action, and, importantly, while excluding jailers who have had a recent confrontation with the inmate, are what reasonable jailers would do in a cell extraction.  Since Carrillo was a morbidly obese inmate suffering a severe psychotic episode, the decision to perform a cell extraction at the time it was executed was, in and of itself, a decision that violated Carrillo's Eighth Amendment right to be free from cruel and unusual punishment, especially considering the fact that he was tasered, in a prone position, after already being restrained, and, with a large person applying pressure to his upper back.

22

59.     Considering the common knowledge among Texas jailers, Texas county officials, and Texas county health officials, a reasonable jailer could not have believed that the conduct of the jailers during the cell extraction of Carrillo, a morbidly obese inmate suffering a severe psychotic episode, was reasonable. Standards applicable to cell extractions were violated. Common sense dictates that a violent assault of a psychiatric patient or inmate undergoing a psychotic attack is not reasonable and lawful especially considering the fact that he was tasered, in a prone position, after already being restrained, and, with a large person applying pressure to his upper back.

### B.  Supervisor Liability for Constitutional Violations.
**(42 U.S.C. § 1983)**

60.     Plaintiffs hereby incorporate all preceding paragraphs and further allege as follows. Jailers Buendia, Galvan, Rodriguez, and Lopez were under the direct supervision of Lt. Lowke ("Supervisor"). Such jailers violated Carrillo's Constitutional rights as delineated herein. Supervisor failed to properly supervise jailers Buendia, Galvan, Rodriguez, and Lopez by, among other things, allowing the extraction to occur, by allowing Galvan and Rodriguez to participate in an extraction, by allowing Lopez to apply immense pressure to the upper back of Carrillo while he was prone, by tasering Carrillo after he was restrained, by failing to have medical attendants present for the extraction, and, by not recording the extraction. Such failures to supervise by the Supervisor proximately resulted in the decisions and conduct manifested in the violent assault of a morbidly obese psychotic inmate undergoing a psychotic attack. Such conduct was a violation of Carrillo's rights under the Eighth Amendment to the Constitution. And Supervisor's failure properly supervise was more than mere negligence or even gross negligence because fundamental jail policies and procedures – known by all competent and reasonable jail supervisors – dictate that a cell extraction follow certain basic procedures and steps in order to ensure that an inmate's

Constitutional rights are not violated. Supervisor did nothing to ensure such standards were followed, and, even more, actively participated in conduct that directly violated such standards – violations that proximately resulted in Carrillo's death.

### C. Cause of Action against Nueces County, Texas

**"Municipal" Liability for Constitutional Violations.**
**(42 U.S.C. § 1983)**

61.     Plaintiffs hereby incorporate all preceding paragraphs and further allege as follows. In March of 2018, the admission of severely mentally ill inmates into the Nueces County Jail, their integration into the general jail population, and, the discipline and control of such inmates in the same manner as mentally healthy inmates was standard operating procedure for such County. Then County Judge Lloyd Neal publicly admitted that mentally ill inmates did not belong in the Nueces County jail:  "Statistics tell us that 20 to 25 percent or more of those in our jails have some mental problem – they don't belong in jail. [...] They belong in a treatment facility." Apparently conceding that no such policy or custom existed at the time, Nueces County Sheriff Jim Kaelin said in March 2018 that he "was open to any program that [could help] keep people out of the jail and in a position where they could get help for mental health issues."  Kaelin also stated that local government like the County is best equipped to help such citizens. "Any program that keeps them out of the county jail has got to be a beneficial program, and it's got to start at the local level because the people live and are governed at the local level," he said.  Regarding the problem of incarcerating mentally ill inmates in the County Jail – rather than putting them in treatment facilities – Judge Neal stated in March 2018, "[w]e've got to figure this out."  The custom of receiving, housing, and handling severely mentally ill inmates at the Nueces County jail in the same manner as mentally healthy inmates did not change until a new policy was adopted in September 2019 with an emphasis on "Jail Diversion," defined as, "pre and post-booking services

that identify individuals with serious mental illness and/or a substance abuse/dependence disorder in contact with the justice system and redirect them from incarceration to community-based mental health and/or substance abuse treatment and support services as appropriate." After adopting the new policy, Nueces County's new County Judge stated, "This is a historic day in Nueces County – we're taking our county back. [...] Behavioral health is a crisis and people are hurting, and guess what, the bell tolls for us."

62.     Nueces County is liable for the actions of its employee jailers who killed Carrillo because the events and conditions that resulted in his death were direct results of the County's 2018 custom of admitting severely mentally ill inmates and housing and handling them in the same manner as the general jail population. The custom or policy obviously existed, since a new policy has replaced it. The former and current County Judge's and Sheriff's own words prove the prior custom was well known.

63.     And this incident involving Carrillo was not an isolated event. It was admitted by Nueces County's principals in March of 2018 that mentally ill inmates did not belong in the county's jail. If Nueces County had had adequate facilities and trained personnel to handle mentally ill inmates, then mentally ill inmates would "belong" in the Nueces County jail. Instead, and specifically in March 2018, the problem of Nueces County's inability to properly handle mentally ill inmates was so notorious, its principals publicly acknowledged it. And they did so for good reason. "Problems that are so common as to be generally known will trigger liability even if the specific application of that problem to Plaintiffs' decedent is not known." *Cheek v. Nueces County Texas, et al.*, 2013 WL 4017132 *14 (S.D. Tex. 2013), citing *Farmer v. Brennan*, 511 U.S. 825, 843-44, 114 S.Ct. 1970 (1994) (officials need not anticipate who would fall victim when they had reason to know that someone likely would). In 2009, upon admission to the jail, mentally ill

inmate Eric Green was assaulted, slammed to the ground, tasered, and pinned to the cell floor by multiple Nueces County Jail Officers. It wasn't until a Nurse instructed the guards to remove their weight from Mr. Green that he was given a chance to breath. But, as a result of the restraint methods, Green lost consciousness and was transported to Christus Spohn Hospital. Green's mental illness was obvious to the jailers and other inmates; however, his need for mental health evaluation and treatment was ignored and when he returned from the hospital, Green was stripped of his clothing and forced to spend the majority of the next three days in his cell without clothes. The following day, Green was beaten by jailers and left in his cell naked and bleeding. Then, the following day after that, Mr. Green was transported to the hospital, admitted in a comatose state, and discovered to have facial fractures of his orbital bones and nasal cavity.  He was placed on a ventilator, gastric tube, and urinary catheter and underwent emergency surgery. A year later, Nueces County jail inmate Gregory Cheek, suffering from bipolar disorder and paranoid schizophrenia, spent days in his cell hallucinating and having psychotic episodes during which he would talk to himself and flood his cell with water. Despite a history of involuntary commitments to mental facilities, being found incompetent to stand trial, and recommended to be transferred to a state hospital by the late psychiatrist Dr. Maldonado, Nueces County jail officials allowed Cheek to become malnourished, he lost significant weight, and ultimately contracted a fatal leg infection. When Cheek's family filed a §1983 suit, this Court found a nexus between "the County's policies regarding housing pretrial detainees and staffing for medical and mental health conditions of those in its custody [and] [...] the injuries to, and death of, Gregory from medical and, allegedly, mental health conditions."   *Cheek v. Nueces County Texas, et al.*, 2013 WL 4017132 *17.

### D. <u>Eighth Amendment Inadequate Medical Care</u>.
**(42 U.S.C. § 1983)**

64.     Plaintiffs hereby incorporate all preceding paragraphs and further allege as follows. As Carrillo's mental condition deteriorated over the 48-hours prior to his death, the risk to his physical well-being grew.  By the time of his psychiatric meltdown the night of March 4 and morning of March 5, Carrillo was in dire need of acute psychiatric intervention to prevent injury to himself or others. During defendant supervisor Lt. Lowke's shift the evening of March 4th and morning of the 5th, rather than calling qualified medical providers to address Carrillo's outbursts, Lowke, and his subordinate Jailers at his direction, decided to apply force. Application of force to a morbidly obese person in the throes of a psychological emergency carries the substantial risk of cardiac stress and arrest. Rather than addressing the medical risk already present from Carrillo's obesity and mental illness by facilitating treatment by a psychiatric health provider for appropriate therapy, the supervisor Lowke and the subordinate Jailers increased it by entering Carrillo's cell and beating him and tasering him. Lowke's directions and conduct are the manifestation of deliberate indifference to the risk to Carrillo created by his morbid obesity and emergent psychiatric event. And the force was a proximate cause of Carrillo's death; indeed, the Medical Examiner labeled the manner of Carrillo's death a "homicide."

65.     Objectively, being morbidly obese and diagnosed with schizophrenia, major depression, anxiety disorder, bipolar disease, or polysubstance abuse poses a risk of medical complications, but, does not necessarily pose a substantial risk of serious harm. However, if, over a multi-day period, such a person's psychiatric disorders cause him to devolve into a paranoid "crazy" person who is yelling non-sensical statements, hallucinating, and soiling himself, not effectively treating such a person medically would pose a substantial risk of serious cardiac harm. During his shift the evening of March 4 and morning of March 5, and at all relevant times, Lowke was aware of Carrillo's condition and had a duty to appropriately respond. And, again,

intentionally assaulting such a person would greatly increase such risk. The risk of cardiac harm to Carrillo caused by the violent cell extraction and drive stun tasering was obvious and it was disregarded by Lowke and the other Jailers.

### E.  Eighth Amendment Conditions of Confinement.
#### (42 U.S.C. § 1983)

66.     Plaintiffs hereby incorporate all preceding paragraphs and further allege as follows. As described earlier, confinement of a medically complex inmate with disease processes that demand an appropriately sophisticated response requires conditions of confinement that can effectively preserve his Constitutional rights under the Eighth Amendment. Incarcerating an inmate who is morbidly obese, and who has been diagnosed by psychiatrists with schizophrenia, major depression, anxiety disorder, bipolar disease, and polysubstance abuse within the general pretrial population without appropriate attendant medical care is a condition of confinement for such inmate that violates his Eighth amendment right to be free from conditions that result in extreme deprivation of a minimal measure of life's necessities. The necessities of life that Carrillo required were different than those within the mentally healthy jail population. Stated plainly, mentally ill inmates are exceptional and require more medically specialized conditions. Such necessity is borne out by the fact that Nueces County now diverts inmates like Carrillo away from the Nueces County jail and to facilities more appropriate for such a person. Knowing that Carrillo was mentally ill wasn't enough; supervisor Lowke had a duty to then ensure that the conditions of his confinement afforded him a minimal measure of the necessities required by such diseases:  to be followed by a psychiatric health provider for appropriate therapy.

67.     The extreme nature of the deprivation of psychological or psychiatric services to Carrillo is proven by the horrific and painful descriptions by the other inmates of how Carrillo's demeanor and mental health deteriorated. They described him over a multi-day period as

constantly weeping, crying out paranoid non-sensical statements, throwing materials out of his jail cell, and hallucinating. It was not reasonable to deny Carrillo psychiatric medical care during the days leading up to his death. The Texas Rangers' investigation into Carrillo's death revealed that he had stopped taking prescription medicines and was not being treated by a psychiatric or psychological professional. The denial of care to such an inmate violates contemporary standards of decency; indeed, newly adopted policies and procedures are designed to address such standards of decency.

### F. <u>Bystander Liability</u>
**(42 U.S.C. § 1983)**

68.     Plaintiffs hereby incorporate all preceding paragraphs and further allege as follows. Defendants Buendia, Galvan, Rodriguez, Lowke, and Lopez each knew that their fellow officers and employees were violating Carrillo's rights, as they were present during the cell extraction and saw Danny's suffering.

69.     Defendants Buendia, Galvan, Rodriguez, Lowke, and Lopez each had a reasonable opportunity to prevent the harm to Mr. Carrillo.

70.     Despite their knowledge of the ongoing violation of Carrillo's constitutional rights, and the opportunity to prevent the harm to Mr. Carrillo, Defendants Buendia, Galvan, Rodriguez, Lowke, and Lopez intentionally chose not to act to assist him.

### G. <u>Liability against Nueces County under Texas Tort Claims Act</u>

71.     Alternatively, Plaintiffs allege that defendant Lowke, while in the course and scope of his employment with the Nueces County Sheriff's Department, negligently used the Taser, a tangible piece of personal property that was, at the time, owned by Nueces County.  Nueces County, through its employee Lowke, was the ultimate user of the Taser.  Lowke's use of the Taser was negligent because he used it on a morbidly obese person suffering a psychotic event, and, it

was placed not on an extremity, but, rather on Carrillo's trunk, only inches from his heart in drive

stun mode.  Lowke's placement of the taser on the particular part of Carrillo's body reflected a

decision and act that were separate from those acts and decisions that culminated in the actual cell

incursion, the force used against Carrillo by Lowke's subordinates, and even the decision to use

the taser at all.  A Jailer exercising ordinary care would have applied it to an extremity and not

close to Carrillo's heart.  Lowke failed to use the Taser in the same manner that a reasonable jailer

would have used it in the same or similar circumstances. Lowke's use of the Taser that constitutes

negligence was a proximate cause of Carrillo's sudden cardiac arrest, and, all of Plaintiffs'

damages.  Nueces County timely received notice of this Texas Tort Claims Act claim.

## V. PLAINTIFF'S DAMAGES

72.     Plaintiffs seek and are entitled to general, special, economic and noneconomic,

wrongful death and survival damages, as applicable to each, in an amount in excess of the

minimum monetary jurisdictional limits of the court, as determined to be just and fair by the jury.

Such damages include, but are not necessarily limited to:

    a.     Wrongful Death Damages:

        (1)     pecuniary loss in the past and future;
        (2)     loss of consortium, companionship and society in the past
                and future;
        (3)     mental anguish in the past and future; and
        (4)     all other damages allowed by law and equity.

    b.     Survival Damages – Estate of Daniel Emilio Carrillo:
        (1)     pain and mental anguish;
        (2)     funeral and burial expenses; and
        (3)     all other damages allowed by law and equity.

73.     Plaintffs are entitled to and seek an award of attorney fees and costs under 42 U.S.C.

§1988(b).

74.     Plaintiffs seek costs of court and pre-judgment and post-judgment interest as

allowed by law.

## PRAYER

WHEREFORE, Plaintiffs pray that this cause be set for trial before a jury, that they recover

judgment of and from the Defendants for the actual damages in such amount as the evidence may

show and the jury may determine to be proper, together with prejudgment interest, post-judgment

interest, reasonable attorney's fees, costs of court, and such other and further relief to which they

may show themselves to be justly entitled.

<div style="margin-left:40%">

Respectfully submitted,

/s/ John Flood
John Flood
Texas Bar No. 07155910
Southern District of Texas bar number 12593
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
(361) 654-8877
(361) 654-8879 Fax
john@floodtriallawyers.com
irma@floodtriallawyers.com
Attorney-in-Charge for Plaintiffs

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2020, I electronically filed the foregoing with the Clerk of Court for the U.S. District Court, Southern District of Texas, Corpus Christi Division, using the CM/ECF system of the court. The undersigned hereby certifies that a true and correct copy of the foregoing instrument was forwarded to all counsel of record, via CM/ECF pursuant to the Federal Rules of Civil Procedure.

<div style="margin-left:40%">

 /s/ John Flood
John Flood

</div>