United States District Court
Southern District of Texas
**ENTERED**
August 10, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ARMANDO CARRILLO, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:20-CV-28 |
| | § | |
| OLIVER BUENDIA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER ON MOTIONS TO DISMISS</u>

This is a civil rights action arising out of the tragic death of Daniel Carrillo (Carrillo). He was a large man with serious psychological illnesses who died in the course of a cell extraction in the Nueces County jail. Plaintiffs[1] bring claims against Nueces County and five of its jailers in their respective individual capacities under 42 U.S.C. § 1983, alleging deliberate indifference to serious medical needs and excessive force. D.E. 35. They also bring a claim against Nueces County under the Texas Tort Claims Act.

Each Defendant has filed a motion to dismiss Plaintiffs' complaint for failure to state a claim on which relief may be granted under Federal Rule of Civil Procedure 12(b)(6) and for failure to negate claims of immunity or qualified immunity. D.E. 44, 46, 48, 49, 51, 52. Two Defendants also seek to strike certain allegations in Plaintiffs' complaint. D.E. 51, 52. Plaintiffs have responded. D.E. 54. And Defendants have replied. D.E. 59, 61, 62, 63, 67, 69.

---

[1] Plaintiffs are Armando and Alicia Carrillo, Individually, and Armando Carrillo as Representative of the Estate of Daniel Emilio Carrillo, Deceased.

For the reasons set out below, the motions to strike are DENIED.  Each motion to dismiss is GRANTED IN PART and DENIED IN PART.

## STANDARD OF REVIEW

The test of pleadings under Rule 12(b)(6) is devised to balance a party's right to redress against the interests of all parties and the court in minimizing expenditure of time, money, and resources devoted to meritless claims.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Furthermore, "Pleadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).  The requirement that the pleader show that he is entitled to relief requires "more than labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Factual allegations are required, sufficient to raise the entitlement to relief above the level of mere speculation.  *Twombly*, 550 U.S. at 555.  Those factual allegations must then be taken as true, even if doubtful.  *Id*.  In other words, the pleader must make allegations that take the claim from conclusory to factual and beyond possible to plausible.  *Id*. at 557.  The *Twombly* court stated, "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

## FACTS

### A. Factual Allegations in Plaintiffs' Amended Complaint

Pursuant to the standard of review, the Court takes the facts pled as true and also makes any inferences arising from those facts in favor of Plaintiffs. Consequently, Defendants' suggestions that there are or may be other explanations justifying their conduct are inappropriate at the Rule 12 stage of these proceedings. Those suggested facts are disregarded here. This factual recitation is taken from Plaintiffs' amended complaint. Any alleged discrepancies between the original and first amended complaint are addressed in the discussion following the facts.

### 1.      Carrillo is Housed Without Attention to His Medical Needs

Carrillo was a morbidly obese man measuring five feet-six inches tall and weighing 295 pounds. He had been diagnosed with schizophrenia, major depression, anxiety disorder, bipolar disease, and polysubstance abuse and was prescribed significant medication for his illnesses. The events leading to his death began on March 24, 2014, when he was arrested for burglary of a habitation at his uncle's abandoned home, foraging for metal to recycle for cash.

The charge was deferred for three years. However, after only two years, the deferred adjudication was revoked, his charge was adjudicated, and he was sentenced to probation, which included in-patient treatment for his mental illness and substance abuse problems. After being discharged to a transitional halfway house in early 2018, he walked out before his scheduled departure. Believing that an arrest warrant had been

issued, Carrillo and his father went to the Nueces County probation office on February 12, 2018, to manage the situation.  As instructed, they immediately registered Carrillo with Alcoholics Anonymous.  However, while they continued to wait at the probation office, a police officer arrived, arrested Carrillo, and took him to the Nueces County jail where he remained until his death.

At the time Carrillo was placed in jail custody, jail personnel were informed of the name of his psychiatrist, his history of mental disease and treatment, along with his history of substance abuse, which included pharmaceuticals.  At that time, he was already visibly tearful, disheveled, and anxious.  Over the next two weeks, Carrillo's mental condition declined, including withdrawal symptoms associated with his use of Xanax to treat his anxiety disorder.  He reported this to jail staff.  The only relief available was Xanax that he got from a "friend inside the jail."

On February 28, 2018, Carrillo expressed to his father that he was going to go crazy if he was not released soon.  One of the jailers, Defendant Jose Rodriguez (Rodriguez), described Carrillo as "off" and in an "altered state of mind."  Carrillo told his lawyer's employee that he got into something with "Tango Blast," was having problems, and was suffering from anxiety.  By March 2 and 3, 2018, Carrillo was observed as very emotional and crying.  His call to his father became more urgent, with Carrillo expressing concern, in hushed tones, that the guards were setting him up to fight with "Tango members" and that no one from the outside world could control it.  His father expressed his concern about Carrillo's mental health and self-medication.

Soon, Carrillo was observed in his cell nude and throwing his belongings out of his cell.  He cried all day and all night for two days, saying "I'm sorry."  He was inconsolable, blabbering, and clearly in a psychotic episode.  Jailers and inmates observed that Carrillo was hallucinating—hearing and seeing things that were not real.  Nonetheless, he was locked in his cell, unarmed, and did not pose a threat to the officers, other County employees, himself, or any other inmates or detainees.  Despite Carrillo's demeanor and actions, other persons in custody were able to sleep through the night.

### 2.    Galvan Beats Carrillo

The jailers did not seek medical attention for Carrillo's mental and physical spiral.  Instead, in the evening of March 4, 2018, guards began yelling taunts and profanity at Carrillo, telling him to be quiet.  When Carrillo continued to cry, Defendant Jesus Galvan (Galvan), irritated, opened the door to Carrillo's cell and "beat his ass."  While an intervening violent cell incursion took place before Carrillo died (set out below), Plaintiffs note that Carrillo's beaten face exhibited both dried and fresh blood, suggesting that the dried blood came from this Galvan beating.

### 3.    The Jailers Enter Carrillo's Cell to Extract Him

Carrillo remained "belligerent, irate and off."  But rather than seek medical attention for Carrillo, four officers—Defendants Rodriguez, Galvan, Oliver Buendia (Buendia) and non-party Veronica Garcia (Garcia)—assembled to perform what they represented to be a cell extraction.  They did this despite the fact that Carrillo did not pose a threat to himself or others.  Rather, they were acting out of anger to inflict punishment.  When justifying their actions to the Texas Rangers, Defendants asserted that

the rationale for the extraction was to move Carrillo closer to medical personnel.

The officers did not issue any orders for Carrillo to obey.  They simply rushed into the cell for a take-down.  They immediately took Carrillo to the ground on his stomach. Garcia radioed for assistance and eventually got a handcuff onto Carrillo's right arm.  At this point, Lieutenant Thomas Lowke (Lowke) and Officer Marcus Lopez (Lopez), both Defendants, arrived.  Lopez, described as a very large man, dug his knee into Carrillo's back and put pressure onto him while he was prone on the floor.  Lopez was able to complete the handcuffing, but Lowke told Garcia to go get leg irons.

### 4.    Lowke Tases Carrillo and Carrillo Dies

After Carrillo was handcuffed, and while he remained on his stomach on the floor, Lowke drive-stun tased Carrillo in the back near his heart.  Defendant officers "pounded" Carrillo and Lopez stomped on Carrillo's head.   By the time Garcia returned with the leg irons, they were not needed.  Carrillo lay non-responsive on the floor and had defecated on himself.  When a nurse eventually arrived, she found no pulse.  His nose was broken and bleeding, his face was bruised, blood covered his face, his right eye was swollen and shut, and there was fluid buildup behind his eye.  When emergency personnel arrived to try to revive Carrillo, Defendant jailers falsely reported that Carrillo had been fighting with four guards and was tased and wrestled to the ground.

Carrillo's size made him vulnerable to the worst effects of the electrical shock of a taser.  Electrical shock can cause cardiac arrest, as opposed to a heart attack (which is a circulation issue).  Carrillo died of cardiac arrest.  An inmate who saw Carrillo's body rolled out on a stretcher commented that "Carrillo's face looked like it got hit by a truck

and it was covered in blood." The Nueces County Medical Examiner determined that Carrillo's cause of death was homicide, indicating that it did not result from Carrillo's own mental and physical illnesses.

### 5.   Cell Extraction Policies

**TCOLE**. The Texas Commission on Law Enforcement (TCOLE) is a regulatory agency of the State of Texas, establishing and enforcing standards for constitutional methods of law enforcement. Those standards prohibit the use of force as a punishment in a jail setting. Cell extractions are to be executed by an Emergency Response Team specifically trained for that purpose. The team is to provide medical attention and first aid for the inmate.

**TDCJ**. The Texas Department of Criminal Justice (TDCJ) Use of Force Plan provides that a forced move (cell extraction) must be ordered by the highest ranking shift supervisor on duty at the time, which did not happen in Carrillo's case. The extraction team must exclude any officer who has had a prior confrontational contact with the inmate. However, both Galvan and Rodriguez,[2] who had such hostile contacts prior to the team's use of force, were not only on the team, they spearheaded it.

Moreover, the TDCJ policy requires that licensed medical staff be notified in advance and, if possible, medical staff should be present. And medical staff should

---

[2]   In their amended complaint, Plaintiffs do not specifically plead any direct confrontation between Rodriguez and Carrillo prior to the cell extraction. Yet there are traces of allegations that suggest such an encounter. In Plaintiffs' response, they state that Rodriguez and Galvan "may have" entered Carrillo's cell together and beat him and, later, that they "had previously entered Carrillo's cell." D.E. 54, pp. 7, 10. Absent affirmative pleadings in that regard, the Court does not interpret Rodriguez to have participated when Galvan allegedly beat Carrillo. However, it is not necessary to make that determination for the issue of stating a claim related to improper persons participating in the cell extraction team. It is enough that Plaintiffs allege that Galvan had a previous violent physical contact with Carrillo and was on the cell extraction team.

advise the officers of any existing medical conditions that preclude the use of force.  Such force can exacerbate pre-existing conditions and trigger a psychotic episode or deepen depression.  For this reason, force should be used only in an emergency.  But while qualified medical personnel were available in Carrillo's case, they were not notified, consulted, or present before or during the use of force.  And the events did not amount to an emergency.

TDCJ policy also requires videotaping of any cell extraction.  But Carrillo's extraction was not recorded in any manner.

### 6.    Nueces County's Approach to Mentally Ill Inmates

The Nueces County Judge stated on March 14, 2018, that 20 to 25 percent of jail inmates have mental problems that indicate that they do not belong in jail; they belong in a treatment facility.  The Nueces County Sheriff agreed.  However, Nueces County did not make a separate treatment facility available for mentally ill inmates and did not consult medical personnel in connection with use of force events—contrary to state standards for operation.  No accommodation was made for Carrillo's mental disabilities.

Nueces County did not train law enforcement personnel in how to recognize and manage inmates with mental disabilities.  Nor did Nueces County provide sufficient training on distinguishing erratic behavior from aggressive behavior or how to de-escalate or intervene in a psychological crisis.  In fact, Defendant Lowke, a lieutenant, did not attend his first Use of Force training course until after Carrillo's death.

**B.     Prior Pleading and Motions to Strike**

Each Defendant complains that Plaintiffs made certain admissions of fact in their original complaint that their amended complaint omits or contradicts.  They argue that the Court should consider those previous admissions in adjudicating the issues.  Defendants Lowke and Galvan further seek to strike the amended complaint for this reason.  D.E. 51, 52.

According to the Fifth Circuit, admissions in superseded pleadings lose their binding force, but may still be used as evidentiary admissions.  *Sanders v. Univ. of Tex. Pan Am.*, 776 Fed. Appx. 835, 837-838 (5th Cir. 2019) (per curiam).  At the same time, the pleading party may explain the changes or controvert the basis for the initial allegations so as to justify their abandonment.  *Id*. at 838.  When amended pleadings are a transparent attempt to conform the facts to the requirements of the cause of action and represent diametrically opposed recollections of the events, the Court has discretion to reject the changes as sham.  *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324–25 (Fed. Cir. 1998) (rejecting allegations that were materially changed without adequate explanation); *see also*, Fed. R. Civ. P. 11(b).

"The degree to which the two complaints are inconsistent is the critical inquiry.  'Reconcilable small variations are acceptable, but direct contradiction is not.'"  *Pelfrey v. Mahaffy*, 17-CV-80920, 2018 WL 3110794, at *5 (S.D. Fla. Feb. 2, 2018) (citing *Clay v. Howard University*, 128 F. Supp. 3d 22, 27 (D.D.C. 2015)).  Moving from general allegations to specific factual detail does not represent a contradiction.  *Id*. (citing *Machado v. Cal. Dep't of Corr.*, 2011 WL 1195616, *3 n.1 (C.D. Cal. March 25, 2011)).

In *Pelfrey*, the plaintiff amended his complaint to drop allegations related to his theory that the defendants intended to defraud him at the outset of the contractual relationship. Instead, he alleged that the malfeasance began later, when it was manifested, which allowed him to defeat the statute of limitations. In that scenario, the *Pelfrey* court wrote:

> I do not find that this rises to the level of direct contradiction, such that the court ought to afford the presumption of truth only to the earlier allegations. In early stages of a civil case it is not uncommon for litigants to change theories, or emphasize certain facts, based upon how litigation evolves.

*Pelfrey*, 2018 WL 3110794, at *5.

The Court notes that in Defendants' authorities, the plaintiff was personally involved in the facts on which the case was based, thus straining credulity when the basic facts changed. Here, however, the allegations that Defendants challenge are not facts within Plaintiffs' personal knowledge. So they do not contradict themselves when they learn new information or understand it in a different way as the case develops.

The Court evaluates the specific allegations to determine their source and the extent of contradiction. The following chart sets out the comparative language regarding the fact allegations to which Defendants refer:

|   | Original Complaint, D.E. 1 | ¶ | Amended Complaint, D.E. 35 | ¶ |
|---|---|---|---|---|
| 1 | "On March 3 and 4, 2018, Carrillo was seen in his cell nude, throwing his belongings out of his cell while crying, 'I'm sorry!'" | 21 | *Identical* | 19 |
| 2 | "By 1:00 a.m., Carrillo began to 'kick his cell door and scream out nonsense, "Tango blast is coming for 2P, Tango blast killed my family and attorney"' . . ." | 22 | " . . . by 1:00 a.m. on March 5, 2018, Danny was an inconsolable, blabbering person suffering through a psychotic episode." | 20 |

| | Original Complaint, D.E. 1 | ¶ | Amended Complaint, D.E. 35 | ¶ |
|---|---|---|---|---|
| 3 | ". . . when a guard tried to speak to him, Carrillo responded, "suck my d---." Carrillo used the mattress in his cell to block the guards' view of him inside his cell. Defendants Buendia and Rodriguez responded and removed the mattress 'without incident.'" | 22 | *Omitted* | |
| 4 | "The mistreatment [after being beaten by Galvan] enraged the psychotic Danny. Another guard taunted Danny and 'talked sh-- to the dude.' Danny responded by 'ranting and raving.' The scene was loud, chaotic and violent." | 24 | "Officer Rodriguez in his written statement described Carrillo's state in an interaction between the two just minutes before the extraction as 'belligerent, irate and off.' But instead of calling for medical assistance, he and other officers reacted angrily.  It was amidst this enraged and anger-fueled environment that a violent and unreasonable (alleged) cell extraction took place." | 22 - 23 |
| 5 | ". . . the hazardous and anger-fueled extraction was executed and devolved into 'a struggle [...] due to the fact that Inmate Carrillo was refusing to comply.'" | 25 | "Garcia denies that any of the officers were giving Carrillo any sort of orders or commands at that time [upon entering the cell and taking Carrillo to the ground, trying to handcuff him]." | 24 |
| 6 | "While enduring the acute psychiatric episode within his cell, Carrillo posed no immediate threat to the safety of the jailers and other inmates. Only after officers initiated their unreasonable and un-Constitutional cell extraction . . . did any risk to the jailers arise. And Carrillo's resistance to the arrest, seizure and attempted extraction cannot be divorced from his illnesses and the acute psychiatric episode he was enduring when his deranged mind told him to resist." | 59 | | |
| 7 | "Carrillo's resistance – though no doubt painful to the jailers and not a permissible response by an inmate under normal circumstances – does not excuse nor make reasonable the particular uses of force that resulted in Carrillo's injuries and death." | 59 | A reasonable, responsible, and Constitutionally permissible response to such a psychiatric episode involving a morbidly obese inmate would attempt to minimize the inmate's opportunity for resistance. Instead, the jailers – with no medical attendants – chose to engage Carrillo in a manner that maximized the opportunity for him to resist. | 57 |

| | Original Complaint, D.E. 1 | ¶ | Amended Complaint, D.E. 35 | ¶ |
|---|---|---|---|---|
| 8 | "Lt. Lowke used his Taser on Carrillo's back to drive-stun him during the handcuffing process, and Carrillo was eventually securely cuffed behind his back." | 27 | "While Lopez dug his weight into Carrillo's upper back, he was able to grab ahold of Carrillo's left hand and complete the handcuffing of Carrillo. Lopez told Garcia to get out of the way so that the men could deal with Carrillo. Garcia . . . saw Lieutenant Lowke drive stun taser Carrillo in the back. According to Garcia's interview with the investigating Texas Ranger, Carrillo was already handcuffed behind his back when Lowke drive-stun tasered him." | 24 |
| 9 | "Officer Rodriguez stated that after the shackles were applied, they directed Carrillo to get up, but Carrillo 'just laid there.'  At this time, the officers dragged Carrillo out from his cell and attempted to put him in a wheelchair. During this process, Carrillo's body fell out of the wheelchair and officers tried repeatedly to situate his unconscious body in the chair.  Carrillo was sprawled out on the floor, dead, handcuffed.  Allegedly, it wasn't until after the handcuffs were removed that Lt. Lowke noticed Carrillo was not breathing and at this time called for medical assistance.  The Jailers did not consult with medical staff before or during the cell extraction." | 27 | "[W]hile he was still in the cell, Carrillo was non-responsive and had defecated on himself. When a nurse eventually arrived, Carrillo was still prone on his stomach and had no pulse." | 24 |

Defendants have not described exactly how all of these alleged discrepancies are consequential to the Rule 12(b)(6) decision.  They state only in conclusory terms that the omitted or the original allegations show that no claim is proper or that Defendants are entitled to qualified immunity.  **Allegation 1** does not represent a change at all, other than the allegation appearing in a different paragraph from the original complaint.

**Allegations 2, 4, and 7** initially emphasized the extent to which Defendants provoked Carrillo.  As amended, the allegations focus on Carrillo's psychological condition and how the violent confrontation, including any resistance, was caused by

Defendants' unconstitutional actions in failing to recognize and accommodate for Carrillo's psychiatric condition and, instead, proceeding with an unjustified physical confrontation.

The omission of the mattress incident in **allegation 3** appears to be irrelevant. While it describes Carrillo as rude and belligerent, it also notes that the situation could be resolved peacefully—that violent physical confrontation was not necessary. Defendants have not shown how this incident should affect the Court's analysis of the pleadings.

**Allegations 5 and 6** appear to be concessions that Carrillo failed to comply with orders and resisted. The change in the allegation to state that no orders were issued comes from Garcia's account of the circumstances. As Plaintiffs were not present at the time, they can only rely on the information obtained from witnesses. As set out above, Plaintiffs may adopt factual allegations based on newly acquired information as the case develops. Plaintiffs still allow that Carrillo resisted the physical assault. The change in allegations simply pleads that Defendants' unconstitutional conduct preceded any resistance.

**Allegation 8** originally stated that Lowke tased Carrillo "during the handcuffing process"[3] and that Carrillo was eventually handcuffed. It did not address the timing of the tasing. The amended allegation clarifies that the tasing, while a part of the process, was done after the handcuffs were secured. The amended allegation notes that it is based

---

[3]   Defendants Galvan and Lowke represent that the original pleadings stated, "While Carrillo was resisting being handcuffed, Lowke used a taser to drive-stun Carrillo on the back of his trunk. *Id.* ¶¶ 27, 57, 58. Eventually, after being drive-stunned Carrillo was handcuffed. *Id.* ¶ 27." D.E. 51, pp. 4-5; 52, p. 5 (emphasis in original). That is not an accurate paraphrasing of the factual allegation and certainly does not comply with the standard of review requiring inferences in favor of Plaintiffs.

on eyewitness Garcia's account, making it an appropriate change.

Defendants challenge **allegation 9** as altering representations regarding whether medical assistance was timely requested.  The original allegations were taken from Rodriguez's account.  And the representation with respect to when they discovered that Carrillo was not breathing is preceded by the term "allegedly" in the original complaint. The amended allegations come from Garcia's account.  As Plaintiffs were not present at the scene, they are within their prerogative to plead the case pursuant to the evidence in which they have the most confidence and that best represents their theory of the case. Moreover, the timing of the call for medical assistance after Carrillo was rendered unconscious or dead is not the only denial of medical care alleged in this case.

In sum, the Court does not find the original allegations and the amended allegations to be so contradictory as to warrant disregard of the amended allegations.  The amendments are less a change of facts than a modification of their characterization.  To the extent they represent changed facts, Plaintiffs have explained those changes as based on eyewitness recollections.  This is not a case in which a plaintiff's initial fact allegations are definitive and the changes to their substance are mere shams to keep the case alive.

As initially pled, and as continued in the amended complaint, this case is about whether Defendants' conduct was lawful, considering Carrillo's mental and physical state.  For instance, there may be evidence that Carrillo resisted Defendants' cell extraction maneuver.  But the constitutional question is whether Defendants properly initiated the cell extraction in the first place—whether Carrillo was a threat in his cell,

whether the only appropriate intervention was medical or physical, whether Defendants had and followed appropriate policies for inmates with demonstrated psychiatric illness, and whether Carrillo was capable of compliance, given the conditions under which Defendants held him and the events of the days and hours preceding his death.

The amended allegations do not change the nature of this case and are not sham pleadings that reverse essential facts just to survive dismissal. Rather, they are modifications that have evolved with the evidence uncovered and continue to try to focus on the essence of the case: mental and physical disabilities in a jail setting. The Court DENIES the motions to STRIKE and rejects Defendants' arguments that the amended allegations should be disregarded or that the superseded allegations should control.

## MOTIONS TO DISMISS

Defendants have expressed some confusion regarding which claims have been pled against which Defendants. And they respond to each claim that might have been pled against them in an abundance of caution. In discussing each claim, the Court starts with an assessment of which Defendant(s) must respond by parsing through the amended complaint and Plaintiffs' clarifications in their response to the motions. The Court then considers the rubric for decision and its analysis of the sufficiency of the pleadings. If the Court determines that a prima facie cause of action has been pled, the Court next considers the qualified immunity defense.

### A. Qualified Immunity Standards

To survive a qualified immunity defense at the pleading stage, the plaintiff must show that the factual allegations support a determination that the official violated a

statutory or constitutional right and that the right was clearly established at the time of the challenged conduct. *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carrol v. Carman*, 574 U.S. 13, 16 (2014) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"Although a case directly on point is not necessary, there must be adequate authority at a sufficient level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). In the context of qualified immunity, each defendant's acts must be examined individually. *Kitchen v. Dallas Cnty., Tex.*, 759 F.3d 468, 478 (5th Cir. 2014), *abrogated on other grounds*, *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015).

## B. EXCESSIVE FORCE
### Violation of the Eighth Amendment:
### Cruel and Unusual Punishment
(42 U.S.C. § 1983)

### 1. Defendants Implicated

Plaintiffs assert the excessive force claim against the jailers, specifically naming individual Defendants Galvan, Lowke, Rodriguez, Lopez, and Buendia with respect to the cell extraction. In addition, Plaintiffs allege that:

- Defendant Galvan gratuitously beat Carrillo prior to the cell extraction;

- Defendant Lowke unnecessarily tased Carrillo after he was adequately restrained and in a manner that could do the greatest harm to him; and

- Defendant Lopez dug his knee into Carrillo's upper back while he was prone and applied unnecessary weight, then stomped on Carrillo's head.

Therefore, each of the individual Defendants must respond to this cause of action.

### 2.  Rubric for Decision

In evaluating an excessive force claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *McCoy v. Alamu*, 950 F.3d 226, 230 (5th Cir. 2020) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)) (quotation marks omitted).  Courts focus on the prison official's subjective intent, determined by reference to five well-known factors set out in *Hudson*.  *Id*.

Those factors are nonexclusive and include: "(1) the extent of the injury suffered by the inmate; (2) the need for the application of force; (3) the relationship between the need for force and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) efforts made to temper the severity of a forceful response." *Id*. (quotation marks omitted); *see also*, *Hudson,* 503 U.S. at 7.  Because excessive force claims are necessarily fact-intensive, the analysis depends on the facts and circumstances of each particular case.  *Pratt v. Harris Cnty., Tex*., 822 F.3d 174, 181 (5th Cir. 2016). Even when officers act in unison, their conduct must be evaluated separately.  *Id*.

### 3.  Defendant Buendia

Defendant Buendia is named in the count for excessive force with respect to having participated in the team that executed the cell extraction.  The only related factual allegation in the amended pleading that identifies his specific conduct is that Buendia,

with Galvan and Rodriguez, rushed into the cell and took Carrillo to the ground.  D.E. 35, ¶ 24.  While Plaintiffs argue that "the jailers'" aggravation was the motivating factor and that "the guards" were seen pounding Carrillo (D.E. 54, pp.16-18), such global allegations do not provide the Defendant-specific factual support required by *Twombly/Iqbal* and *Pratt*.[4]  Therefore, the excessive force analysis against Buendia is limited to entering Carrillo's cell and immediately taking him to the ground.

**Injury**.  While there is no allegation that asserts an injury sustained in the take-down (separate and apart from other actions regarding the application of pressure, tasing, and "pounding"), an unwarranted physical confrontation can constitute excessive force, even without a separately identifiable injury.  *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (per curiam).  Plaintiffs have alleged that Carrillo posed no threat to himself or others, but Buendia still physically attacked him.  And inferences in favor of Plaintiffs allow the Court to attribute both offensive force and some injury resulting from the conduct.  The first *Hudson* factor thus supports Plaintiffs' pleading of an excessive force claim.

**Need and Proportionate Force**.  Plaintiffs allege that the take-down was not necessary for any proper purpose.  While Defendants contend that they needed to restore discipline and place Carrillo closer to medical facilities, Plaintiffs have alleged that there was, in fact, no breach of discipline and no orders were given for Carrillo to resist.  They

---

[4]   The amended pleading defines "the jailers" (but not "the guards") as including all five individual Defendants and two former Defendants who have been nonsuited.  D.E. 35, ¶ 12.  The Court cannot interpret allegations against "the jailers" or "the guards" as including each of those seven individuals—or even all five named Defendants—because "the jailers" is used to refer to actions that, in other allegations, were clearly taken by fewer than all seven.  For instance, the jailers decided to execute a cell extraction, but Lowke and Lopez arrived only after the event was in progress.  The jailers are said to have pounded Carrillo, but Garcia had left to retrieve leg irons and was not present, chronologically, when this conduct occurred.  Therefore, "the jailers," without more, is not sufficiently specific to support the assertion of facts against particular Defendants.

further allege that no Defendant had consulted with medical personnel and that proximity to medical facilities is an after-the-fact pretext provided by Defendants to justify their actions.  Construing the pleadings and all inferences in favor of Plaintiffs, the Court finds that the pleadings support the conclusion that there was no need for the take-down and therefore, the amount of force used greatly exceeded the need.  *See generally*, *Wilson v. Rheams*, 494 Fed. App'x 469, 470 (5th Cir. 2012) (per curiam) (unprovoked attack where prisoner was in custody stated a claim for excessive force).  Thus the second and third *Hudson* factors support Plaintiffs' excessive force pleading against Buendia.

**Threat**.  Plaintiffs allege that when Buendia made the decision to enter Carrillo's cell and take him down, he could not reasonably believe that Carrillo posed a threat to him.  Carrillo was behind bars.  Any resistance from Carrillo was the effect of the physical force, not a cause of it.  It is well-settled that the use of force is excessive when a prisoner is already in custody and is not resisting.  *See generally*, *Davis v. E. Baton Rouge Par. Sheriff's Office*, CIV.A. 08-C-708, 2010 WL 4962812, at *3 n.21 (M.D. La. Dec. 1, 2010) (collecting cases).  The majority of Defendants' briefing to the contrary involve cases in which the prisoner had to be brought under control.  Those cases are inapposite here, where Plaintiffs allege that prior to the application of force, Carrillo was not physically out of the control imposed by his custody.  Neither was he resisting or posing a threat.

Buendia cites *Sams v. Quinn*, No. 17-1419, 2017 WL 4574497, *2 (6th Cir. Sept. 7, 2017) for the proposition that there is no Eighth Amendment excessive force claim when force is used against a non-combative prisoner in order to get him to medical

treatment.  But the facts of that case are distinguishable.  Sams was suffering from life-threatening hypoglycemia.  The defendants needed to get him medical treatment and he refused their instructions to leave the cell and, instead, invited them to tase him, which they did.  They then took him for medical treatment without further incident.  Here, the pleadings do not assert that Carrillo was experiencing any life-threatening medical emergency.  And the force applied is alleged to have been more than was necessary to get him any required medical attention.

Neither is Buendia's citation of *City & County of San Francisco, California v. Sheehan*, 575 U.S. 600 (2015), helpful.  There, the Supreme Court declined to determine whether special rules apply with respect to the use of force on those with psychiatric issues.  Any such rule would have been new and thus would have supported the qualified immunity defense.  The Court did not reach the issue because the plaintiff was clearly armed with a weapon and threatening to others.  Consequently, the threat she presented was sufficient to justify the force used.  Because the pleadings do not support the conclusion that Carrillo posed a threat, *Sheehan* is distinguishable and the fourth *Hudson* factor supports Plaintiffs' excessive force claim.

**Tempering Severity**.  Plaintiffs contend that Defendants did nothing to temper the severity of the force used.  With respect to the take-down in which Buendia was involved, the decision was made to rush into the cell and physically take Carrillo to the ground to further restrain him.  Nothing in the pleadings suggests that the force used was tempered in any way to account for the fact that Carrillo was already in custody and posed no threat.  There is nothing to suggest that, even if the cell extraction was done to

get Carrillo closer to medical facilities, the extraction was the least onerous and effective means of obtaining health care for Carrillo.   Therefore, the pleadings satisfy the fifth *Hudson* factor.

Buendia argues that his conduct should not be judged by consideration of Carrillo's mental illness.   The Court notes Carrillo's mental illness does not present a reason to depart from the *Hudson* factors nor does it excuse Buendia's disproportionate reaction to the annoyances Carrillo presented.   *See generally*, *Kitchen*, 759 F.3d at 484 (reversing summary judgment in favor of defendants).   It is sufficient that Plaintiffs plead that Buendia knew that Carrillo was restrained in his cell and posed no threat to himself or others and Buendia nevertheless entered the cell and took Carrillo down.   Buendia's additional argument—that an officer can exert force to bring an arrestee under control—has no application to these allegations, asserting that Carrillo was already confined in a jail cell.

**Beyond Debate**.   Buendia, incorporating the briefing of other Defendants, argues that the applicable parameters of this excessive force claim are not "beyond debate." D.E. 62, p. 5.   This argument assumes that the Court will apply special rules based on Carrillo's mental disabilities.   However, his mental state need not be taken into account here.   A claim can be based on the use of force against a jailed inmate who is not experiencing a life-threatening medical emergency, poses no threat to himself or others, and has not breached jailhouse disciplinary concerns.   These are not new contours for the right to be free of excessive force.

Because the *Hudson* case is well-established law and the contours of the excessive force claim are well-defined by the cases cited here, qualified immunity does not eliminate the claim as a matter of law at the pleading stage.    The Court DENIES Buendia's motion to dismiss the excessive force claim against him.

### 4. Defendant Rodriguez

The excessive force claim against Defendant Rodriguez is essentially the same as that against Defendant Buendia.  And their arguments and briefing are the same.  The only exception is that there are additional allegations that Rodriguez had a specific intent to harm Carrillo.[5]   Rodriguez objects to the sufficiency of the pleadings regarding his intent or motivation.   D.E. 59, p. 2.   However, those allegations are not necessary to sustain the claim for excessive force.  For the reasons set out above with respect to the excessive force claim against Buendia, the Court DENIES Rodriguez's motion to dismiss the excessive force claim against him.

### 5. Defendant Galvan

The excessive force claim against Defendant Galvan is the same as that against Defendant Rodriguez, including allegations of specific intent to harm Carrillo.  And the arguments are the same.   Thus, the Court DENIES Galvan's motion to dismiss the excessive force claim based on the cell extraction take-down as discussed above. Additionally, the amended complaint alleges that Galvan brutally beat Carrillo before the cell extraction maneuver.  The Court now applies the *Hudson* factors to that event.

---

[5]   There are suggestions in the amended complaint that Rodriguez had engaged in a prior confrontation with Carrillo.  Plaintiffs' allegations in that regard are unclear and do not form the basis of the Court's excessive force decision as to Rodriguez.

**Injury and Need**.   The amended complaint alleges that Carrillo suffered substantial injuries to his head and face, including a broken nose.  Such injuries are not necessary to support a finding of excessive force, but certainly bolster them.  *See Wilkins,* 559 U.S. at 38.  Just as with the cell extraction event, Plaintiffs have alleged that the circumstances surrounding Galvan's individual confrontation, while not ideal, did not justify physical contact.  Carrillo was in custody in a jail cell; he was not a threat to himself or others.  The amended complaint states sufficient facts to show that there was no need for the application of force.

**Proportionate Force, Threat, and Tempering Severity**.   Where no force was necessary and significant force was applied, Galvan's conduct is clearly alleged to have been disproportionate.  As noted, Carrillo was securely within his assigned jail cell such that Galvan could not reasonably perceive any physical threat from him.  And there were no efforts to temper the severity of a forceful response.   According to the amended complaint, Galvan did not attempt any medical intervention and the verbal exchanges leading up to the event were alleged to be taunts and insults rather than efforts to de-escalate the situation.   As described, the alleged physical beating was severe and unmitigated.  Thus, Plaintiffs have stated a case for excessive force against Defendant Galvan with respect to all five *Hudson* factors regarding the beating prior to the cell extraction.

**Pleading Standard**.  Galvan argues that Plaintiffs have no way of proving that he engaged in this conduct, had the requisite intent, or that it was inappropriate under the circumstances.  He claims that the factual pleadings are insufficient and conclusory under

23 / 49

*Twombly/Iqbal.*  However, Plaintiffs have factually charged Galvan with wrongdoing that is not merely formulaic.  They have stated the time and place of the event, supported by the eyewitness observation of another inmate.  Intent is determined as a matter of inference under *Hudson*, as already demonstrated.  And Plaintiffs are entitled to all inferences from the facts pled.  The claim must be "plausible," not "certain."  The Court rejects Galvan's argument that the pleadings are insufficient with respect to the alleged gratuitous beating.

A jury could conclude, on the basis of the allegations, that Galvan's conduct in the beating prior to the cell extraction maneuver was not to maintain or restore discipline, but to maliciously and sadistically cause harm.  The Court DENIES Galvan's motion to dismiss with respect to the excessive force claims.

### 6.  Defendant Lopez

According to the amended complaint, Lopez was not present at the initial cell incursion and take-down.  Plaintiffs' complaint against him is that "Lopez, who is a very large man, climbed over to the area near Carrillo's head and immediately dug his knee into Carrillo's upper back and put pressure onto Carrillo's back while Carrillo was prone on the floor."  D.E. 35, ¶ 24.  Plaintiffs allege that Lopez maintained pressure for at least the amount of time it took to get Carrillo handcuffed.  After that, "An inmate who claims to have witnessed the event stated that . . . [he] believes he saw Officer Lopez 'stomping the dude's f------ head.'"  *Id.*, ¶ 25.

By joining the effort to handcuff Carrillo while the operation was in progress, Lopez is not personally charged with knowing that before the operation began, Carrillo

posed no threat or was in psychiatric crisis.  The threat assessment must be made at the time Lopez acted.  *Thompson v. Mercer*, 762 F.3d 433, 440 (5th Cir. 2014) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992) (relevant threat is "at that moment" when the officer engaged in the conduct complained of)).  At that time, the difficulty Defendants were having in handcuffing Carrillo was due, at least in part, to Carrillo's failure to cooperate—his resistance to the application of force.

Both Lopez and Carrillo are alleged to have been large men.  According to the amended complaint, Defendants were having enough difficulty handcuffing Carrillo that they called for backup.  Lopez was that backup.  To overcome Lopez's claim of qualified immunity, Plaintiffs must be able to show that it was clearly established at the time that applying the amount of pressure for the duration at issue in that context clearly violated Carrillo's rights.  Plaintiffs do not attempt to do so.  The amended complaint, while reciting Lopez's application of pressure, does not state that it was done in a manner that clearly violated Carrillo's rights.

In their response, Plaintiffs recite cases in which the application of pressure was held to constitute excessive force.  D.E. 54, p. 30.  But they do not demonstrate that their holdings apply here.  Carrillo was not hogtied.  *See Harris Cnty. v. Nagel*, 349 S.W.3d 769, 785 (Tex. App. 2011) (citing *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 903 (6th Cir. 2004).  Neither are there allegations that Lopez applied the pressure longer than necessary to incapacitate Carrillo.  *See Champion,* 380 F.3d at 893.  And they do not contend that Carrillo died of asphyxiation or trauma to the neck or spine, but rather of cardiac arrest associated with being tased.  *See Simpson v. Hines*, 903 F.2d 400, 403 (5th

Cir. 1990).  Therefore, at this pleading stage, the Court does not base its excessive force ruling regarding Lopez on his application of pressure to Carrillo's back in order to complete the handcuffing process.

Instead, the Court focuses on the allegation that Lopez stomped on Carrillo's head after he was handcuffed.  According to the *Hudson* analysis, Carrillo was severely injured in his face and head with a broken nose, lacerations, bruises, and a lot of blood.  Plaintiffs have alleged that there was no need to hurt his head or face because Carrillo was on the ground, handcuffed, and had been tased.  "Stomping" on a person's head is certainly something a jury could find to be a disproportionate response to any need to further restrain an already handcuffed man on the floor of a jail cell.  The amended pleading does not disclose any threat to Lopez at the time of his actions and nothing suggests that stomping on Carrillo's head was a tempered response to any need.  Plaintiffs' amended pleading thus states a claim for excessive force against Lopez.  Lopez's motion in that respect is DENIED.

### 7. Defendant Lowke

The excessive force claim against Lowke is based on the allegation that after Defendants had successfully handcuffed Carrillo, Lowke drive-stun tased Carrillo on his back.  D.E. 35, ¶ 24.  Lowke applied the taser within inches of Carrillo's heart.  *Id.*, ¶¶ 55, 71.  The electrical impulse of the taser in such close proximity to the heart could result in cardiac arrest, which is exactly what happened.  *Id*., ¶¶ 37-39.

**Injury, Need, and Proportionality**.  Plaintiffs allege that Carrillo's injury from the tasing was fatal cardiac arrest.  They allege that there was no need for tasing because

26 / 49

Carrillo was already prone on the floor with his hands cuffed behind his back.   They allege that tasing was disproportionate to any need because it is known to be deadly force, which is not warranted when a man is already significantly restrained, in a jail setting, unarmed and surrounded by law enforcement personnel.

**Threat and Tempering Severity**.   According to Plaintiffs, Carrillo did not pose any threat to Defendants.   And rather than wait for the leg irons he had requested, which would have been a tempered response to any continued resistance (which Defendants, not Plaintiffs, allege), Lowke dramatically increased the severity of the force by needlessly tasing Carrillo and doing so in close proximity to his heart rather than on an extremity. Plaintiffs have met the *Hudson* factors that govern the excessive force analysis.

Lowke argues that force can be applied within the scope of qualified immunity after a person is handcuffed, citing *Lombardo v. City of St. Louis*, 956 F.3d 1009, 1014 (8th Cir. 2020).   In that case, it was undisputed that after being handcuffed and leg-shackled, the inmate continued to thrash around and hurt himself.   The officers placed him in a prone position to subdue him and as soon as he was calm, rolled him out of the prone position.   Here, no such undisputed facts of violent resistance are pled.   According to Plaintiffs, once Carrillo was handcuffed, he was sufficiently subdued.   The standard of review requires the Court to view the facts and inferences in Plaintiffs' favor.   And this case does not reflect a measured response to any continued resistance in that Plaintiffs allege that the tasing was a gratuitous infliction of potentially—and actually—deadly pain.

Lowke also cites *United States v. Sanders*, 994 F.2d 200, 209 (5th Cir. 1993), for the proposition that handcuffing a person does not impair his ability to use his legs and feet to walk, run, or kick.  Carrillo was prone on the floor of a jail cell surrounded by Defendants; there is no suggestion that he could walk or run anywhere at that time. Neither is there any admission that Carrillo was kicking or using his legs in any way to create a problem for Defendants.

*Sanders* was not an excessive force case.  There, police responded to a complaint of a suspicious person with a gun on business premises.  The officers stopped Sanders, who fit the description.  They handcuffed him, frisked him, and found a loaded gun.  He was arrested for carrying a concealed weapon and was later charged as a felon in possession of a firearm.  The opinion was written on the motion to suppress the evidence of the gun.  The only issue for the court was whether, after handcuffing Sanders, the officer could justifiably frisk him for weapons.  The court found that it was reasonable for an officer to frisk Sanders for weapons after handcuffing him in the field.  This case does not support the use of deadly force on a handcuffed prisoner who is not suspected of having a weapon and who cannot flee.

Lowke also argues that Carrillo's mental illness cannot change the parameters under which his conduct is evaluated.  As is the case with the other motions to dismiss, the Court's decision is based on the contours of the Eighth Amendment without consideration of Carrillo's mental illness or his psychotic state at the time of the conduct complained of.  Thus the Court need not further address this argument.  Likewise, Lowke also complains that the applicable law is not clearly established or beyond debate.  As

with the other Defendants, the Court rejects this argument.  *Hudson* and the cases cited here are clear about the applicable contours of excessive force.  Lowke's motion to dismiss the excessive force claim against him is DENIED.

### C. BYSTANDER LIABILITY
**Violation of Constitutional Rights as Bystanders**
**Observing Excessive Force in Violation of the Eighth Amendment**
(42 U.S.C. § 1983)

#### 1.  Defendants Implicated

The bystander claim is alleged against the five individual Defendants as being aware of each other's constitutional violations during the cell extraction maneuvers and failing to take action to prevent harm to Carrillo.  Therefore, Defendants Buendia, Galvan, Rodriguez, Lowke, and Lopez must respond to this claim.

#### 2.  Rubric for Decision

"Bystander liability may be established where an officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"  *Kitchen*, 759 F.3d at 480 (quoting *Whitley v. Hanna*, 726 F.3d 631, 646–47 (5th Cir. 2013)).  Bystander liability applies where a plaintiff properly alleges another officer's use of excessive force.  *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  A plaintiff is not required to identify which of multiple officers applied the excessive force.  *Kitchen*, 759 F.3d at 481.

#### 3.  Analysis

Defendants assert that the bystander allegations are factually insufficient.  As demonstrated above, Plaintiffs have adequately alleged that each of the individual

Defendants personally engaged in excessive force related to the cell extraction maneuver.[6]  That application of force was alleged to be open and obvious within the confines of a jail cell and was even observed by another inmate.  It is within the realm of appropriate inferences—required under the standard of review—that Defendants observed conduct that was known to them to constitute unconstitutional excessive force.

Defendants worked as a team with a common goal.  Thus, they were all present and in communication with each other.  This places them in a position to take reasonable steps to prevent the harm to Carrillo.  The Court may also consider acquiescence in the alleged constitutional violation as part of stating a claim for bystander liability.  *Whitley*, 726 F.3d at 647.  Plaintiffs have adequately alleged that each individual Defendant participated and acquiesced in the excessive force applied to Carrillo and no Defendant tried to prevent any harm.  Therefore, the factual allegations and reasonable inferences satisfy each of the elements of this claim.

Lowke and Lopez argue that they arrived after the initial take-down and cannot be held liable under a bystander theory for acts they did not observe.  *See id.* at 646.  While that is true, Plaintiffs also alleged that unspecified Defendants kicked and beat Carrillo after he was subdued, Lopez stomped on Carrillo's head after handcuffing him, and Lowke tased Carrillo after he was handcuffed.  Lowke and Lopez were present at the time of those alleged instances of excessive force.  Therefore, each Defendant was present for one or more acts of excessive force that he personally observed, could have

---

[6]  Plaintiffs defend this cause of action against Rodriguez, in part, on the theory that he was present when Galvan beat Carrillo prior to the cell extraction.  D.E. 54, p. 25.  However, the factual allegations in the amended complaint fall short of pleading Rodriguez's presence or observation of that incident.  Therefore, the Court focuses only on the cell extraction in evaluating this claim.

prevented, and failed to address.

Defendants also suggest that the bystander liability claim was not clearly established at the time of the conduct and that qualified immunity therefore shields them. *E.g.*, D.E. 46, p. 15. But bystander liability has been defined and applied in the Fifth Circuit for at least four decades. *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citing *Harris v. Chanclor*, 537 F.2d 203, 205–06 (5th Cir. 1976)). The Court has already addressed the clearly established contours of the excessive force claim, above. The Court does not find the application of bystander liability here to be novel or unusual and Defendants have failed to point out any manner in which the contours of bystander liability for excessive force are unclear as applied to this case. Consequently, qualified immunity does not protect Defendants. *See Simpson,* 903 F.2d at 403 (holding that individual officers acting as a group were not entitled to qualified immunity even though the evidence suggested that only two of the ten had applied force sufficient to cause the plaintiff's injuries).

### D. SUPERVISOR LIABILITY
**Violation of the Eighth Amendment:**
**Cruel and Unusual Punishment/Excessive Force**
(42 U.S.C. § 1983)

#### 1. Defendant Implicated

Plaintiffs assert the supervisor liability claim only against Defendant Lowke, alleging that he supervised the other four individual Defendants.

### 2.  Rubric for Decision

The Fifth Circuit has described the requirements of supervisor liability as follows:

> Section 1983 does not create vicarious or respondeat superior
> liability.  Rather, a plaintiff must show either the supervisor
> personally was involved in the constitutional violation or that
> there is a "sufficient causal connection" between the
> supervisor's conduct and the constitutional violation.   A
> supervisory official is held to a standard of "deliberate
> indifference," which requires proof that the supervisor
> "disregarded a known or obvious consequence of his action."
> A supervisor will not be held liable for unintentional
> oversights.

*Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003) (citations omitted).

### 3.  Analysis

Plaintiffs plead that, as the supervising officer, Lowke failed to properly supervise the jailers, allowing the cell extraction to occur unnecessarily and allowing the extraction to proceed contrary to protective policies.  Those policies include the requirement to exclude officers who had prior confrontations with Carrillo, the requirement for a medical consult and, if possible, attendance by medical personnel.

Absent from the pleading are factual allegations that would support a finding that Lowke's acts were causally linked to the acts of the subordinates and that Lowke's conduct rose to the level of deliberate indifference.  While Lowke personally participated in the cell extraction, the allegations indicate that he arrived as backup.  Plaintiffs have claimed that Galvan and Rodriguez spearheaded the cell extraction.  D.E. 35, ¶ 31. Nothing in the pleadings suggests that Lowke was responsible for training the jailers on cell extractions or that he was consulted before, or participated in, the decision to initiate

the extraction.  And nothing indicates that Lowke gave any other Defendant any orders or instructions, or that Lowke was aware, prior to the cell extraction, of Carrillo's condition or conduct.  And the pleadings are conclusory regarding the failure to follow policies.

Plaintiffs point only to the personal involvement of Lowke in the cell extraction and a conclusory assertion that he had knowledge of Carrillo's deteriorating mental state. D.E. 54, pp. 24-25.  These are not the acts of a supervisor who has caused his subordinates to engage in constitutional violations.  The amended pleading, while suggesting the basis for supervisor liability as it could apply in this case, contains only conclusory allegations. Because Plaintiffs' assertions give no import to any supervisory role that Lowke may have had, this claim is indistinguishable from a bystander claim. Thus, Lowke's motion to dismiss the supervisory liability claim is GRANTED.

### E.  FAILURE TO PROVIDE MEDICAL CARE
### CONDITIONS OF CONFINEMENT
### Violation of the Eighth Amendment:
### Cruel and Unusual Punishment
### (42 U.S.C. § 1983)

Plaintiffs have asserted two related causes of action:  (1) failure to provide medical care; and (2) inhumane conditions of confinement.  As pled, both complain of the failure to deliver mental health care in the jail, both are derived from the prohibition against cruel and unusual punishment, and both are alleged against the same three Defendants: Lowke, Galvan, and the County.  Thus, they appear to be duplicative.

The Court separates the claims pursuant to categories of "episodic acts or omissions" and "conditions of confinement," pursuant to *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 644-50 (5th Cir. 1996) (en banc) and *Shepherd v. Dallas*

*County*, 591 F.3d 445, 452–55 (5th Cir. 2009). An "episodic" claim is one that focuses on one individual's misconduct and requires proof of that individual's specific intent— that one or more state actors acted or failed to act with deliberate indifference to the defendant's needs. *Hare,* 74 F.3d at 648. In contrast, the "conditions" claim focuses on a policy that is so unreasonable as to demonstrate deliberate indifference in its development and which causes unconstitutional treatment of the defendant. *Id.* at 645; *Shepherd,* 591 F.3d at 452 (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

### 1. Episodic Acts or Omissions

#### a. Defendants Implicated

While the amended complaint names Defendant Lowke and his subordinate jailers in connection with this claim for episodic failures to provide medical care, Plaintiffs' response asserts that it is brought against Nueces County, Lowke, and Galvan. D.E. 54, p. 20. To the extent that it refers to Nueces County policies with respect to mentally ill inmates, it states a conditions of confinement claim against the County and will be addressed below. The Court analyzes this claim as brought only against Lowke and Galvan.

#### b. Rubric for Decision

A claim for an episodic failure to provide medical care requires the plaintiff to plead that the defendant was deliberately indifferent to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The element of deliberate indifference requires that the defendant was "subjectively aware of the risk." *Id.* In the context of medical care, this level of intent requires factual allegations that prison officials "refused

to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (citation omitted).  "[A] prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

### c. Analysis

The factual discussion of this claim in the amended complaint and in Plaintiffs' response involves Carrillo's withdrawal from prescribed medication and substance abuse and his psychiatric meltdown, particularly over the period of March 4 and 5, 2018.  The complaint is that Defendants observed it, knew it was alarming and that Carrillo was suffering, yet did nothing to obtain medical treatment for Carrillo's obvious psychosis.  As a result, Carrillo predictably sustained serious physical withdrawal as well as psychological harm, even before the application of excessive force.  He was inconsolable, crying, anxious, paranoid, and fearful of bodily harm at the hands of other inmates and the guards who held him.

This scenario supports a claim for failure to provide medical care.  The right to psychiatric care and addiction treatment is included in the scope of the Eighth Amendment. *Partridge v. Two Unknown Police Officers of City of Hous., Tex*., 791 F.2d 1182, 1187 (5th Cir. 1986); *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990) (collecting cases); *see also*, *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (alcohol withdrawal's delirium tremens is a serious medical need).  In a Fifth Circuit case, "Fellow prisoners testified that [the prisoner] seemed physically sick and

that he began to see things, such as the Lone Ranger.  By sundown he was seeing Indians.
He was physically shaking.  He climbed the bars, saying that there was barbed wire on
them and that he was cutting his hands." *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th
Cir. 1979) (alcohol withdrawal).  The Fifth Circuit found an Eighth Amendment claim
supported by the jailers' "cold hearted, casual unwillingness to investigate what can be
done for a man who is obviously in desperate need of help."  *Id.*

According to the amended complaint, the jail staff had been informed of Carrillo's
psychiatric history, drug dependence, and withdrawal.[7]  The pleading further asserts that
anyone in the vicinity was exposed to Carrillo's behavior and suffering, sufficient to
trigger a duty to act on the obvious need for care.  While facially stated as a claim based
on collective knowledge and response, it is sufficient to support individual liability under
*Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002).  The *Lawson* court affirmed
a finding after a bench trial that evidence of the collective knowledge and joint efforts of
the medical staff supported individual findings of deliberate indifference against the
defendants who were members of that staff.

The amended complaint alleges that Galvan was aware of Carrillo's behavior,
having entered the cell in frustration to beat Carrillo.  It is less clear that Lowke had
knowledge of Carrillo's suffering prior to responding as back-up to the cell extraction
call.  However, Plaintiffs plead that Lowke was supervising the jailers at all times.  They

---

[7]  "[T]he jail personnel were informed that Danny had a history of treatment for depression, anxiety, schizophrenia
and that he had a history of use, and abuse, of the pharmaceuticals, Buspar, Zoloft, Trazadone, Risperdal, and
benzodiazepines (Xanax and Clonazepam), and that Danny had been a longtime patient of the late-psychiatrist
Gilbert Maldonado, M.D."  D.E. 35, ¶ 14.  "On February 18, 2018, in a conversation with his father Armando
Carrillo, Danny stated that he had informed jail staff that he was experiencing withdrawals due to not having access
to Xanax because he was placed on "lockdown" and not administered the medication."  *Id.*, ¶ 16.

are therefore entitled to the reasonable inference that Lowke was aware of Carrillo's behavior over the two days in which it spiraled out of control and that he failed to act appropriately on the medical need.[8]

The law regarding the contours of the Eighth Amendment related to failure to provide medical care for the type of illness Carrillo exhibited was clearly established prior to the events of this case, as set out above.  Qualified immunity does not defeat this claim as pled.  Plaintiffs have stated a sufficient claim for Lowke and Galvan's episodic acts of failure to provide medical care.  Lowke and Galvan's motions to dismiss in this regard are DENIED.  The motions of Buendia, Rodriguez, and Lopez are GRANTED on this theory in that Plaintiffs concede that the claim was not intended to apply to them.

## 2. Conditions of Confinement

### a. Defendants Implicated

Plaintiffs' pleading under the conditions of confinement claim names only Defendant Lowke as having a duty to ensure that Carrillo's conditions of confinement were constitutionally appropriate.  In their response, Plaintiffs add a complaint against Defendant Galvan while discussing this theory.  Plaintiffs' response also mentions that the problem was made possible by Nueces County's custom of handling mentally ill inmates the same as general population inmates.

The question here is whether there was an underlying unconstitutional condition of

---

[8]   The Court is aware of the apparent conflict between finding that the pleading fails to state a claim for supervisor liability and finding that it states a claim for failure to provide medical care because Lowke was in a supervisory role.  The difference—as applied in this case—is that supervisor liability requires that Lowke directed others to act in an unconstitutional fashion (which was negated by the factual allegations) whereas supervisor status allows for the inference of knowledge by Lowke.

confinement that resulted in injury.  The condition Plaintiffs allege is housing Carrillo in general population without provision for psychiatric medical treatment.  There are no allegations that Lowke and Galvan had any hand in creating those conditions of confinement.  They did not choose Carrillo's placement and were not alleged to be responsible for ensuring proper levels of medical staffing and expertise.  Consequently, the only Defendant factually implicated in this conditions-of-confinement theory is the County.

### b.  Rubric for Decision

A conditions-of-confinement claim is derived from the Eighth Amendment's prohibition against cruel and unusual punishment, which requires that "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates[.]'"  *Farmer,* 511 U.S. at 832 (citations omitted).  The Fifth Circuit expresses the test for liability as "extreme deprivation of any 'minimal civilized measure of life's necessities.'"  *Gates v. Cook*, 376 F.3d 323, 332–33 (5th Cir. 2004) (quoting *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998)).

The Supreme Court has declared that "the standards against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society' and not the standards in effect during the time of the drafting of the Eighth Amendment."  *Id*. (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).  Liability is based on subjective deliberate indifference to conditions posing a substantial risk of serious harm.  *Id*.

### c.  Analysis

As noted, the jail "condition" of which Plaintiffs complain is the placement of Carrillo in the general population, where there is insufficient medical monitoring and treatment for his physical and mental conditions.  Plaintiffs' response complains of "a deprivation of psychological or psychiatric services that led to a complete deterioration of his mental health."  D.E. 54, p. 23.  As will be discussed below, Plaintiffs allege that the County acknowledged the policy of housing mentally ill inmates with the general population.  And this condition persisted despite the tragic consequences to Eric Green and Gregory Cheek in 2009 to 2011.  Plaintiffs have stated a claim for unconstitutional conditions of confinement against the County.  The County's motion will be addressed in the next section.

The Court GRANTS Lowke and Galvan's motions to dismiss with respect to the conditions-of-confinement claim because of inadequate factual allegations regarding liability under this theory.

### F.  MUNICIPAL LIABILITY
### Violation of the Eighth Amendment
(42 U.S.C. § 1983)

#### 1.  Defendant Implicated

Nueces County, the only Defendant with municipal status under *Monell*, must respond to this claim.

#### 2.  Rubric for Decision

To establish municipal liability, a plaintiff must demonstrate three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose

"moving force" is the formal policy or custom.  *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 694 (1978); *Piotrowski v. City of Hous.,*  237 F.3d 567, 578 (5th Cir. 2001).   In evaluating this claim, the Court treats the claims for excessive force, failure to provide medical care, and conditions of confinement as the relevant "violation of constitutional rights."

### 3.  Analysis

**Policymaker**.   The County stipulates that the sheriff is the appropriate final policymaker for law enforcement.   D.E. 48, p. 9.   However, it complains that the amended complaint did not identify any policymaker responsible for Plaintiffs' claims. The identity of a legally authorized final policymaker for purposes of *Monell* is a question of law.  *Groden v. City of Dallas, Tex*., 826 F.3d 280, 282 (5th Cir. 2016); *see also*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  It need not be pled.  *Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 559 (5th Cir. 2017).   Therefore, if the factual allegations are sufficient to support the claim, the failure to specify a policymaker is not a basis for granting a Rule 12 motion to dismiss.  *Id*.

"It has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected . . . ."  *Turner v. Upton Cnty., Tex*., 915 F.2d 133, 136 (5th Cir. 1990).   Otherwise, the county's governing body is the commissioners court, which is expressly responsible for providing safe and suitable jail facilities.   Tex. Loc. Gov't Code § 351.001(a).   The commissioners court's presiding officer is the county judge.   Tex. Loc. Gov't Code §

81.001.  Thus, to the extent that the relevant policymaking implicates or overlaps those two areas of responsibility—law enforcement and jail facilities—the sheriff and the county judge can be considered final policymakers.

Plaintiffs recited that Nueces County Sheriff Jim Kaelin and Nueces County Judge Lloyd Neal are individuals who were responsible for, and publicly commented on the existence of, the policy at issue.  Plaintiffs have adequately identified the County's final policymakers.

**Policy**.  A policy need not be codified in order to be actionable.  According to the Supreme Court:

> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury.  Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.  These are "action[s] for which the municipality is actually responsible."

*Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (citations omitted).

The policy of which Plaintiffs complain is not a policy of having jail personnel physically attack mentally ill inmates.  That is a predictable result of the policy, but not the policy itself.  Rather, the alleged policy is the County's practice of housing mentally ill inmates with the general jail population, without provisions for adequate mental health care and without addressing the special needs of such inmates.

> Nueces County is liable for the actions of its employee jailers who killed Carrillo because the events and conditions that resulted in his death were direct results of the County's 2018 custom of admitting severely mentally ill inmates and

> housing and handling them in the same manner as the general
> jail population. The custom or policy obviously existed, since
> a new policy has replaced it. The former and current County
> Judge's and Sheriff's own words prove the prior custom was
> well known.

D.E. 35, ¶ 62.

This policy is alleged to be widespread in that it affects conditions of confinement

and vulnerability to excessive force applicable to 20 to 25 percent of the jail population.

Such persons have medical needs that cannot be adequately addressed in the County jail.

And this is the case regardless of whether the policy regularly manifests in situations

sufficient to give rise to justiciable claims of excessive force or failure to provide medical

care.[9]   That is the import of the policymakers' alleged admissions:   there was a

widespread policy of unconstitutional conditions of confinement (particularly lack of

mental health medical care) that set the stage for occasional, but significant, personal

injury and death from excessive force.

The fact that not all mentally ill inmates are the victims of excessive force does

not make the policy underlying those injuries any less widespread or unconstitutional.

Plaintiffs have adequately pled a policy that is either unconstitutional or that is

maintained with deliberate indifference to predictable violations of constitutional rights.

**Moving Force**.   The requirement that the policy be the moving force behind a

deprivation of constitutional rights is one of causation of the injury.  *Piotrowski,* 237 F.3d

at 579.  "While an unconstitutional official policy renders a municipality culpable under §

---

[9]  Plaintiffs do not need to identify numerous similar cases to demonstrate a practice or custom so widespread as to constitute policy because the admissions already satisfy that issue.   Rather, the existence of prior cases of constitutional violations—which need not be numerous—support the deliberate indifference relevant to causation or the "moving force" of the policy.

1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (citations and footnotes omitted).

Plaintiffs have alleged that the policy is unconstitutional in depriving mentally ill inmates of necessary medical care. They have also pointed out tragic cases that highlight the deliberate indifference involved in maintaining the policy, even if it is deemed facially innocuous. Causative deliberate indifference is well-established.

> If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.

*Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). The examples that Plaintiffs have highlighted may be few, but they are sufficient to support a conclusion that the policy, even if not unconstitutional itself, was maintained with deliberate indifference to predictable violations of constitutional rights.

For instance, in *Green v. Nueces County, Texas*, Civ. A. No. C-09-316, 2010 WL 918972, at *1 (S.D. Tex. Mar. 15, 2010), the court recites four instances of improper treatment of the same mentally ill inmate: (1) an unprovoked beating and tasing in the jail; (2) being forced to spend three days in his cell without his clothes; (3) another series of beatings over two days associated with a court appearance; and (4) trying to prevent the inmate's mother from seeing him while he was hospitalized. In *Cheek v. Nueces*

*County, Texas*, Civ. A. No. 2:13–CV–26, 2013 WL 4017132 (S.D. Tex. August 5, 2013), there were also four instances of improper treatment:  (1) the mentally ill inmate was denied prescribed anti-psychotic medication; (2) he was denied visitation by his mother because he could not remember her date of birth; (3) his physical illness was left untreated as it was blamed on his psychotic behavior rather than on the infection he was suffering; and (4) the denial of his psychiatric medications made him incapable of communicating his physical complaints, even after it was clear that medical staff needed his account of his symptoms.

The *Cheek* opinion put the County on notice that the pleading of a claim for unconstitutional conditions facing inmates with psychiatric illnesses could be sustained under *Monell*.  Yet five years later, the same policy was in place, not decried by the policymakers until days after Carrillo's death.  Without determining whether these facts are sufficient to sustain liability after trial, the Court finds them sufficient to state a plausible claim of a policy maintained with deliberate indifference at the pleading stage.

While the County protests that the jailers initiated the cell extraction in order to get Carrillo the medical care he needed, that defense is neither complete nor cognizable at the pleading phase.  Whatever the motivation for the cell extraction, it does not explain the prior Galvan beating or the denial of psychiatric medications for the days prior.  And the Court does not consider defenses at face value at the pleading stage.  Rather, the pleadings and inferences are to be construed in favor of Plaintiffs.

Plaintiffs have alleged that the County's policy of housing mentally ill inmates with the general jail population has resulted in a routine failure to provide proper

psychiatric treatment, along with causing jail personnel to ignore medical needs and to discipline inmates as if they were capable of modifying behaviors over which they have no control.   Thus, Plaintiffs have alleged that the County policy is the moving force behind the unconstitutional application of excessive force and denial of medical care at issue here.   The Court DENIES the County's motion to dismiss the § 1983 claims.

### G.  Negligent Use of Tangible Property
(Texas Tort Claims Act)

#### 1.  Defendant Implicated

While Plaintiffs recite that the claim is based on Lowke's use of the taser, Plaintiffs clearly allege this claim only against Nueces County.   D.E. 35, ¶ 71 (using the heading, "Liability against Nueces County under Texas Tort Claims Act").   Their response confirms that this claim is made only against Nueces County.   D.E. 54, pp. 35-36.

#### 2.  Rubric for Decision

To state a claim against the County under the Texas Tort Claims Act (TTCA), Plaintiffs must allege that a government employee, in the course and scope of employment, caused personal injury by using personal property owned by the County. TTCA, Tex. Civ. Prac. & Rem. Code §§ 101.021(2), 101.0215(1), (7).   Liability must be consistent with a Texas cause of action applicable to private parties.   *Id*.   On the other hand, the TTCA does not allow for claims "arising out of assault, battery, false imprisonment, or any other intentional tort."   TTCA § 101.057.

### 3. Analysis

The only issue briefed by the parties as a basis for dismissing this claim is whether Plaintiffs' state law cause of action—negligence—can apply to the deliberate act of discharging a taser on an inmate when that same act is alleged to constitute excessive force. Plaintiffs argue that they have stated a negligence claim because they assert that Lowke did not intend to kill Carrillo—that the placement of the taser so close to the heart "accidentally" caused cardiac arrest.

The Texas Supreme Court has navigated these murky waters and concluded that such a claim cannot be made under the TTCA. Claims of excessive force arise out of battery, which does not require a specific intent to injure. *City of Watauga v. Gordon*, 434 S.W.3d 586, 592-94 (Tex. 2014). "[T]here is no such thing as a negligent battery, since battery is defined to require an intentional touching without consent not a negligent one." *Id*. at 594 (quoting 1 THE LAW OF TORTS § 31 at 77). Where the claim against law enforcement arises out of battery, the statute expressly excludes a TTCA claim against the governmental employer. *Id*.

Plaintiffs' reliance on *Khansari v. City of Houston*, 14 F. Supp. 3d 842, 873 (5th Cir. 2014), is misplaced. That opinion was issued on April 9, 2014. The *Gordon* opinion was issued on June 6, 2014. And when the matter was revisited in *Khansari*, the TTCA claim was rejected pursuant to *Gordon*. *Khansari v. City of Houston*, CIV.A. H-13-2722, 2015 WL 6550832, at *19 (S.D. Tex. Oct. 28, 2015). The Fifth Circuit has since followed *Gordon*. *Saenz v. City of El Paso*, 637 Fed. App'x 828, 831-32 (5th Cir. 2016) (conduct alleged to constitute an intentional tort cannot also be pled to constitute

negligence for purposes of the TTCA, even in the alternative).

Because Plaintiffs have pled that Lowke's use of the taser amounts to excessive force, the claim is one for battery, not negligence, and is excluded from the TTCA. The Court GRANTS the County's motion to dismiss Plaintiffs' TTCA claim.

## CONCLUSION

For the reasons stated above, the Court DENIES the motions to strike embedded in the Lowke and Galvan motions to dismiss (D.E. 51, 52). The Court further rules that the motions to dismiss are GRANTED IN PART and DENIED IN PART. The rulings are based on the analysis of which claims are asserted against which Defendants and whether those claims are adequately supported, as follows:

- Defendant Buendia's motion to dismiss (D.E. 49) is:
    - DENIED with respect to excessive force;
    - DENIED with respect to the bystander claim;
    - DENIED AS MOOT with respect to supervisor liability;
    - GRANTED with respect to the failure to provide medical care; and
    - DENIED AS MOOT with respect to the conditions of confinement claim.
- Defendant Rodriguez's motion to dismiss (D.E. 44) is:
    - DENIED with respect to excessive force;
    - DENIED with respect to the bystander claim;
    - DENIED AS MOOT with respect to supervisor liability;
    - GRANTED with respect to the failure to provide medical care; and
    - DENIED AS MOOT with respect to the conditions of confinement claim.

- Defendant Galvan's motion to dismiss (D.E. 52) is:
    - DENIED with respect to the claims for excessive force;
    - DENIED with respect to the bystander claim;
    - DENIED with respect to failure to provide medical care; and
    - GRANTED with respect to the conditions of confinement claim.
- Defendant Lopez's motion to dismiss (D.E. 46) is:
    - DENIED with respect to excessive force;
    - DENIED with respect to the bystander claim;
    - DENIED AS MOOT with respect to supervisor liability;
    - GRANTED with respect to the failure to provide medical care; and
    - DENIED AS MOOT with respect to the conditions of confinement claim.
- Defendant Lowke's motion to dismiss (D.E. 51) is:
    - DENIED with respect to excessive force;
    - DENIED with respect to the bystander claim;
    - GRANTED with respect to supervisor liability;
    - DENIED with respect to failure to provide medical care; and
    - GRANTED with respect to the conditions of confinement claim.
- Defendant Nueces County's motion to dismiss (D.E. 48) is
    - DENIED with respect to *Monell* liability for a policy that provided a moving force behind the claims for excessive force, failure to provide medical care, and inhumane conditions of confinement; and
    - GRANTED with respect to the state law claim of negligent use of tangible property under the TTCA.

In sum, this case will proceed against all five individual Defendants with respect to **excessive force** and **bystander** liability.   In addition, it will proceed against Defendants Galvan and Lowke on the claim for **failure to provide medical care**.  It will proceed against the County on *Monell* liability for **excessive force, failure to provide medical care,** and unconstitutional **conditions of confinement**.

ORDERED this 10th day of August 2020.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE